(Prize.)

# The Santissima Trinidad, and the St. An de

The commission of a public ship of a foreign state, signed by the proper
authorities, is conclusive evidence of her national character.

During the existence of the civil war between Spain and her Colonies,
and previous to the acknowledgment of the independence of the lat-
ter by the United States, the colonies were deemed by us bellige-
rent nations, and entitled, so far as concerns us, to all the so-
vereign rights of war, against their enemy.

How far, and under what circumstances, the evidence of witnesses, who
concur in proof of a material fact, but whose testimony is in other
respects contradictory, ought to be credited in respect to that fact.

The sending of armed vessels, or of munitions of war, from a neutral
country to a belligerent port, for sale as articles of commerce, is un-
lawful only as it subjects the property to confiscation on capture by
the other belligerent.

No neutral state is bound to prohibit the exportation of contraband
articles, and the United States have not prohibited it.

In the case of an illegal augmentation of the force of a belligerent
cruizer in our ports by enlisting men, the *onus probandi* is thrown on
him to show, that the persons enlisted were subjects of the bellige-
rent state, or belonging to its service, and then transiently within
the U. S.

The 6th article of the Spanish treaty of 1795, applies exclusively to
the protection and defence of Spanish ships within our territorial ju-

risdiction, and provides only for their restitution, when captured within the same.

The 4th article of the same treaty, which proïbits the citizens or subjects of the respective contracting parties from taking commissions, &c. to cruize against the other under the penalty of being considered as pirates, is confined to private armed vessels, and does not extend to public ships.

*Quere*, Whether a citizen of the United States, independently of any legislative act on the subject, can throw off his allegiance to his native country?

However this may be, it can never be done without a *bona fide* change of domicil, nor for fraudulent purposes, nor to justify the commission of a crime against the country, or any violation of its laws.

An augmentation of force, or illegal outfit, does not affect any capture made after the original cruize, for which such augmentation or outfit was made, is terminated.

But as to captures made during the same cruize, the uniform doctrine of this Court has been, that they are infected with the character of torts, and that the original owner is entitled to restitution, when the property is brought into our jurisdiction.

This doctrine extends to captures by public, as well as private armed ships.

Case of the *Cassius, 3 Dall. Rep.* 121. commented on, and confirmed.

Case of the *Exchange, 7 Cranch,* 116. distinguished from the present case.

The exemption of foreign public ships, coming into our waters, under an express or implied license, from the local jurisdiction, does not extend to their prize ships or goods, captured in violation of our neutrality.

APPEAL from the Circuit Court of Virginia.

This was a libel filed by the consul of Spain, in the District Court of Virginia, in April, 1817, against eighty nine bales of cochineal, two bales of jalap, and one box of vanilla, originally constituting part of the cargoes of the Spanish ships Santissima Trinidad and St. Ander, and alleged, to be unlawfully and piratically taken out of those vessels on the high seas by a squadron consisting of two armed vessels called

1822.

The
Santissima
Trinidad.

the Independencia del Sud and the Altravida, and manned and commanded by persons assuming themselves to be citizens of the United Provinces of the Rio de la Plata. The libel was filed, in behalf of the original Spanish owners, by Don Pablo Chacon, consul of his Catholic Majesty for the port of Norfolk ; and as amended, it insisted upon restitution principally for three reasons : (1.) That the commanders of the capturing vessels, the Independencia and the Altravida, were native citizens of the United States, and were prohibited by our treaty with Spain of 1795, from taking commissions to cruize against that power. (2.) That the said capturing vessels were owned in the United States, and were originally equipped, fitted out, armed and manned in the United States, contrary to law. (3.) That their force and armament had been illegally augmented within the United States.

A claim and answer was given in by James Chaytor, styling himself Don Diego Chaytor, in which he asserted that he was commander of the Independencia, that she was a public armed vessel belonging to the government of the United Provinces of Rio de la Plata, and that he was duly commissioned as her commander ; that open war existed between those Provinces and Spain ; that the property in question was captured by him, as prize of war, on the high seas, and taken out of the Spanish ships the Santissima Trinidad and the St. Ander, and put on board of the Independencia ; and that he, afterwards, in March, 1817, came into the port of Norfolk with his capturing ship, where she was received

and acknowledged as a public ship of war, and the captured property, with the approbation and consent of the government of the United States, was there landed for safe keeping in the custom house store. The claimant admitted that he was a native citizen of the United States, and that his wife and family have constantly resided at Baltimore; but alleged, that in May, 1816, at the city of Buenos Ayres, he accepted a commission under the government of the United Provinces, and then and there expatriated himself by the only means in his power, viz. a formal notification of the fact to the United States consul at that place. He denied that the capturing vessel, the Independencia, was owned in the United States, or that she was fitted out, equipped, or armed, or her force augmented, in the ports of the United States, contrary to law. He denied, also, that the Altrávida was owned in the United States, or that she was armed, equipped, or fitted out in the United States, contrary to law; or that she aided in the capture of the property in question. He further asserted, that the captured property had been libelled and duly condemned as prize in the tribunal of prizes of the United Provinces, at Buenos Ayres, on the 6th of February, 1818. He denied the illegal enlistment of his crew in the United States; but admitted that several persons there entered themselves on board as seamen in December, 1816, representing themselves to be, and being, as he supposed, citizens of the United Provinces, or in their service, and then transiently in the United States; and that he refused to receive citizens of this country, and

actually sent on shore some who had clandestinely introduced themselves on board.

It appeared by the evidence in the cause, that the capturing vessel, the Independencia, was originally built and equipped in the port of Baltimore as a privateer, during the late war between the United States and Great Britain, and was then rigged as a schooner, and called the Mammoth, and was fitted out to cruize against the enemy. After the peace she was converted into a brig, and sold by her original owners. In January, 1816, she was loaded with a cargo of munitions of war, by her new owners, who were also inhabitants of Baltimore, and being armed with twelve guns, constituting part of her original armament, she was sent from that port under the command of the claimant, Chaytor, ostensibly on a voyage to the northwest coast of America, but in reality to Buenos Ayres. By the written instructions given to the supercargo on this voyage, he was authorized, by the owners, to sell the vessel to the government of Buenos Ayres if he could obtain a suitable price. She arrived at Buenos Ayres, having committed no act of hostility, but sailing under the protection of the United States flag during the outward voyage. At Buenos Ayres the vessel was sold to the claimant, and two other persons ; and, soon afterwards, in May, 1816, assumed the flag and character of a public ship, and was understood by the crew to have been sold to the government of Buenos Ayres, and the claimant made known these facts to the crew, asserting that he had become a citizen of Buenos Ayres, and had received

a commission to command the vessel as a national ship; and invited the crew to enlist in the same service; and the greater part of them, accordingly, enlisted. From this period, the public agents of the government of the United States, and other foreign governments at that port considered the vessel as a public ship of war, and this was her avowed character and reputation. No bill of sale to the government of Buenos Ayres was produced, but the claimant's commission from that government was given in evidence.

Upon the point of the illegal equipment and augmentation of force of the capturing vessels in the ports of the United States, different witnesses were examined on the part of the libellant, whose testimony was extremely contradictory; but it appeared from the evidence, and was admitted by the claimant, that after the sale at Buenos Ayres, in May, 1816, the Independencia departed from that port under his command, on a cruize against Spain; and after visiting the coast of Spain, put into Baltimore early in the month of October of the same year, having then on board the greater part of her original crew, among which were many citizens of the United States. On her arrival at Baltimore she was received as a public ship, and underwent considerable repairs in that port. Her bottom was new coppered, some parts of her hull were recaulked, part of her water ways replaced, a new head was put on, some new sails and rigging to a small amount, and a new mainyard were obtained; some bolts were driven into the hull, and the mainmast (which had been

shivered by lightning) was taken out, reduced in length, and replaced in its former station. For the purpose of making these repairs, her guns, ammunition, and cargo, were discharged under the inspection of an officer of the customs; and when the repairs were made, the armament was replaced, and a report made by the proper officer to the collector, that there was no addition to her armament. The Independencia again left Baltimore in the latter part of December, 1816, having at that time on board a crew of 112 men; and on or about the 8th of February following, sailed from the Capes of the Chesapeake on the cruize in which the property in question was captured. During the stay of the Independencia at Baltimore, several persons were enlisted on board her, and the claimant's own witnesses proved that the number was about thirty.

On her departure from Baltimore, the Independencia was accompanied by the Altravida, as a tender or despatch vessel. This last was formerly a privateer called the Romp, and had been condemned by the District Court of Virginia for illegal conduct, and was sold under the decree of Court, together with the armament and munitions of war then on board. She was purchased ostensibly for one Thomas Taylor, but immediately transferred to the claimant, Chaytor. She soon afterwards went to Baltimore, and was attached to the Independencia as a tender, having no separate commission, but acting under the authority of the claimant. Some of her guns were mounted, and a crew of about twenty-five men put on board at Baltimore. She dropped

1822.

The
Santissima
Trinidad.

down to the Patuxent a few days before the sailing of the Independencia, and was there joined by the latter, and accompanied her on her cruize.

The District Court, upon the hearing of the cause, decreed restitution to the original Spanish owners. That sentence was affirmed in the Circuit Court, and from the decree of the latter the cause was brought by appeal to this Court.

*Feb. 28th.*

Mr. *Winder,* for the appellant, (1.) argued upon the facts to show that there had been no such illegal outfit or augmentation of the force of the capturing vessel in our ports, as would entitle the original Spanish owners to restitution of the captured property, on the ground of a violation of our neutrality by the captors.

2. He argued that even supposing the claimant, Chaytor, to be a native citizen of the United States, the capture was not invalidated by the circumstance of his commanding the capturing vessel. Being a public ship of a foreign state, this Court could not, upon its own principles, inquire into her conduct further than to see that she had a regular commission, signed by the proper authorities of that state.[a] It is perfectly consistent with the law and universal practice of nations for neutral subjects to take commissions in foreign wars.[b] This Court has determined that an alien may command a private armed vessel

a The Exchange, 7 *Cranch,* 116.

b *Vattel, Droit des Gens, l.* 3. *c.* 2. *s.* 13. 14. 16. *l.* 3. *c.* 7. *s.* 228. 230. *Bynk. Q. J. Pub. l.* 1. *c.* 22. *Du Ponceau's Transl* *p.* 175.

1822.

The
Santissima
Trinidad.

of the United States, and cruize against their enemy, though it happens to be his own native country.[a] So also the prize-ordinance of Buenos Ayres declares, that all officers of commissioned vessels or privateers belonging to that state, although they may be foreigners, shall enjoy all the privileges of citizens, whilst thus employed.[b]

But it may be said that the Spanish treaty of 1795, renders such an act criminal, and all its consequences void, and therefore this Court cannot listen to the claim of a citizen who has thus violated the supreme law of the land.

The answer to this is, that the treaty shows the idea of the contracting parties, that independently of its stipulations, their respective citizens and subjects might take commissions to cruize against each other without violating the pre-existing law of nations. The sole effect of the treaty is, to subject them to be treated as pirates by the opposite party, if it thinks fit. It excludes them from the protection of their own government, leaves them at the mercy of the opposite party, and excuses the government of the offenders from all responsibility to the other for their misconduct. They are not made pirates by the treaty, but only made liable to be considered as such by the party against whom they act. Would not the government in whose service they held commissions, have a right to retaliate, if they were treated as pirates, either by their own government, or by that

a The Mary and Susan, 1 *Wheat. Rep.* 57.
b 4 *Wheat. Rep. Appx. Note* II. 30.

against which they acted ; since by the law of nations the belligerent might grant to them as foreigners, and they might accept the commissions ?

The treaty operates only between the contracting parties, and cannot interfere with the lawful powers and rights of other nations, under the law of nations ; and between the parties, it only operates to give the belligerent, so far as the neutral contracting party is concerned, a right to treat the citizen as a pirate, without complaint from his government. It dispenses the offended party, so far as the other is concerned, from the obligation to observe the rules of civilized warfare, *quoad* its *citizen* thus implicated ; but it can have no effect upon the rights of the other belligerent *quoad* the *officer* of that belligerent. The party, whose citizens or subjects they are, is not bound to treat the supposed offenders as pirates, and our Courts cannot so treat them in the absence of an act of Congress. The United States are not bound so to treat or consider them. They are simply bound to leave them to the discretion of Spain, and there the effect of the treaty stops. The prohibition of the treaty has its prescribed peril and effect, and cannot, at least judicially, be extended further. To make the treaty bind the United States to restore a prize made by one of its citizens under a commission from a foreign government would be to make a treaty stipulation between Spain and the United States operate to interfere with the undoubted rights of a third foreign power who is no party to the treaty. It would abridge and annul the effect of a commission, which, by the unquestioned law of

nations, he had a right, within his own territory, to grant

The acts of Congress to protect the neutrality of the United States have nothing to do with it, because none of them extend to, or pretend to extend to, the acceptance of a commission in a foreign country by a citizen of this. And the silence of Congress on the subject is a strong legislative exposition of the treaty; for in making provision to preserve the neutrality of the United States generally, and especially in relation to the contest between Spain and her colonies, they have not rendered criminal such acceptance of a commission, and as they have manifested a spirit of some severity on this subject, and are silent on such a case, it is strong evidence that Congress did not feel bound to add any thing to the treaty; since, if they were bound, they would have done so in obedience to this treaty obligation of neutrality as they have done in other cases. Where the law stops, the Courts of justice must stop; *expressum facit tacitum cessare.* The plain object of the law was, even in cases within it, to affect the offending citizen; not to affect the foreign government who employs him; or, in other words, not to authorize a judicial interference with its belligerent acts. The statute committed to the judiciary all that the legislature intended to be within their competency. The rest it reserved for national adjustment by forbearing to submit it to the judiciary. The law must be taken as it is, not expanded by inference. To put a judicial rider upon it, is to legislate. The inference which

would vacate a capture under the commission would be a supplement to the law, would be to legislate on a distinct subject, *i. e.* the effect of a belligerent act by a foreign state. The law is a restraining law, *in terrorem,* aimed at the citizens only. The inference deals with a third party, a sovereign state, who is not subject to our jurisdiction ; and acts in a way which the law does not prescribe ; for the law authorizes nothing but the punishment of the individual. If more had been intended, more would, and ought to have been done ; for the whole subject was well understood from 1794, to 1819, when the last act was passed. There is no positive municipal rule giving judicial jurisdiction as to such a commission, or any commission, even within the law, with reference to the effect of restoring a prize made under it. Every belligerent state has a right to decide upon the means of annoyance, which it organizes against its enemy within its own territory. If its commission to make war can be subject to ordinary judicial question in a neutral tribunal, where it cannot be heard and cannot condescend to appear, it is not a sovereign act. But the granting such a commission is the very highest act of sovereignty, and is peculiarly above ordinary judicial control in foreign countries. The legality, the force and effect of the commission itself, must defy ordinary judicial inquiry, or the belligerent can only authorize war so far forth as neutral tribunals shall think fit to suffer it.

A judicial recognition of the legality of the capture in question by a Court of prize at Buenos Ayres would undoubtedly have put the capture out of

reach of our Court. But the sentence of such a Court is no more a sovereign act, than the granting the commission. It does but ascertain the granting of the commission, and gives to it no new force or validity. The belligerent state is just as much answerable for the wrong done to the neutral state, if any there be, in granting the commission, after the sentence as before. A judicial sentence, in a case of prize, binds for no other reason, than that it is the act of the state to which the Court belongs. That it is a judicial sentence is of no importance. It is the sovereignty of the state, and its right of decision which gives to the sentence its conclusive character, in the view of foreign tribunals : and all this applies equally to the act of granting a commission, within the territory of the belligerent.

All the cases of this class, which have been decided in this Court, turn exclusively upon the fact of an illegal equipment of the capturing vessel within our ports, except that of the *Bello Corrunes*, in which the judgment does indeed refer to the national character of the claimant, Barnes, as repelling his right to claim.[a] But as the facts of that case will show that it might have been determined on the ground of the illegal equipment of the capturing vessel, without giving a construction to the treaty, or ascertaining the national character of the claimant, all that is said by the learned judge who pronounced the opinion of the Court in that case, on these subjects, may be considered as *obiter dictum*.

a *6 Wheat. Rep.* 125. 169.

3. But the claimant, in the case now before the Court, had ceased to be a citizen, before he accepted the commission, and made the capture in question. He had expatriated himself, and become a citizen of Buenos Ayres, by the only means in his power, an actual residence in that country, with a declaration of his intention to that effect. This act is countenanced by the general usage of nations, and was not forbidden by any law of his own country. By the British law, not only are privateers and merchant vessels allowed to enlist foreign seamen, but the mere fact of two years service during war makes them British subjects.[a] A resident neutral in a belligerent country is subjected to the disabilities of the country in which he resides, so far as respects the opposite belligerent, and his trade is considered liable to capture and condemnation as enemy's property. Shall he not then be entitled to the correspondent advantages of his situation ? The hostile character is fixed upon him by residence even if he goes to the belligerent country, with the desire of preserving his neutral character. Shall he not then be entitled to all the advantages of that character, when it is his avowed purpose and object to acquire it ? Length of time generally decides the character of the residence of a neutral to be belligerent or not: but it is taken merely as evidence of his intention, and if that intention is unequivocally manifested in any other mode, his character is instantly fixed.[b]

a  5 Wheat. Rep. Appx. note III. 130
b  Wheat. Dig. Cas. tit. Prize, IV.

4. This capture being made by a public ship, which has come into our ports, together with her prize goods, under the express permission of our government, the Court cannot interfere to restore the captured property to the original owners upon the ground that the capturing vessel has committed a violation of our neutrality. The ship itself must certainly be exempt from the local jurisdiction.[a] And if the ship be exempt, it is difficult to perceive how any other property of the same sovereign, which he has acquired and holds *jure coronæ*, can be subjected to the local jurisdiction by being brought into the territory under the same permission. Still less can the prizes made by a ship which is herself exempt from the jurisdiction of the local tribunals be subjected to that jurisdiction. These prizes are as much the property of the sovereign, *jure coronæ*, as the ships by which they are taken and brought in.

The illegal augmentation of her force by the capturing vessel in our ports, cannot forfeit the immunity to which she is entitled by the law and usage of nations. Enlistments of men for this purpose, are not presumed to be made with the assent of the belligerent sovereign, and are not to be imputed to him.[b] It is, therefore, an offence which is not to be visited on the sovereign or his property. Reprisals cannot lawfully be made, until application to him for redress has been made. Courts of justice cannot interfere in such a case, because the sovereig cannot condescend to appear in them, and they have no

a The Exchange, 7 *Cranch,* 116.
b *Vattel, Droit des Gens, l.* 3. *s.* 15.

regular means of knowing how far he approves of what has been done by his officers. But, upon remonstrance and diplomatic discussion, the whole affair may be heard, and remedies applied fit for the occasion. Judicial decision, if it can interfere at all, is inflexible ; and when the fact is established, must make entire restitution of the captured property, however insignificant may be the augmentation of force by neutral means. Besides, it is bringing into judgment the highest concerns of nations to be determined by the testimony of the basest of mankind. The enlistment of a single seaman on board a single ship of a large squadron, may draw after it the restitution of a whole enemy's fleet. The only safe course then is, to leave matters of this sort to negotiation, or at least not to take cognizance of them in Courts of justice, unless upon the application of the offended state, as in the analogous case of a capture within neutral territory.[a]

5. But, at all events, the condemnation of the prize goods, which took place at Buenos Ayres, in a Court of the captor, is conclusive to preclude this Court from taking jurisdiction of a question which has already been determined in a competent tribunal.

Mr. *Tazewell*, contra, stated, that three principal errors were alleged by the appellant in the decrees of the Courts below : 1. That the facts assumed by those Courts did not warrant the decrees. 2. That

*a* The Anne, 3 *Wheat. Rep.* 435.

the condemnation in the tribunal of prizes at Buenos Ayres precluded the Courts of this country from inquiring into the legality of the capture. 3. That our Courts have no authority to make that inquiry because the facts of the case involve the sovereign rights of an independent state.

As to the first objection, it is not necessary to discuss it until the last is disposed of. Jurisdiction must be shown to exist, before its rightful exercise can be proved. He would, therefore, invert the order of the argument, and examine the last mentioned proposition before the others. It would be shown to be the only question of real difficulty in the cause.

The argument on this proposition concedes to the neutral *sovereign*, or state, the very right which it denies to the neutral *judiciary*. Now, to the belligerent sovereign, the effect is precisely the same, whether the interference with his rights be by the executive and legislative departments, or by the judiciary alone. In either case his rights are examined into, and he may be deprived of them. To the neutral state, also, the effect is the same in both cases, so far as foreign states are concerned; since, in both, the nation is equally responsible for the act done. It is no answer to the reclamation of a foreign sovereign to say, that he has been injured by the judiciary only. To him all the departments of the government make but one sovereignty. This is represented by the executive, of which the judiciary is regarded but as an emanation. It may be, and undoubtedly is, a matter of great moment to the

*neutral state itself*, that its powers be legitimately exercised by those only to whom they have been confided by the municipal constitution. But this is a mere domestic inquiry, in which no foreign state has any concern, nor ought to be permitted to enter. Is it not strange, then, that it should now be presented to us in a litigation between two foreign subjects?

The question being raised, however, it must be discussed ; not for the sake of the parties, but of the Court itself. Let us then concede what the argument asserts, and it has no application to the cause. For justice is blind, and knows not of the existence of the sovereign, or of his rights, until made manifest by its own record. Nor will it notice even what its own record may disclose, unless the matter be therein duly and orderly set forth, *i. e.* by proper parties—in proper time—and in proper form. How, then, is this fact of sovereign right to be duly and orderly disclosed, so as to be made manifest to the Courts of justice, and to shut the judicial eyes to every other fact in the cause? This, although apparently a mere technical question, is one of great importance, especially on account of the practice which has been hitherto pursued by the Courts of the United States in cases of this sort. And at the very threshold of the inquiry it is plain, that the sovereign who denies the authority of the Court to decide, must not *answer*. If he does, he voluntarily submits to, nay, invites the exercise of the very authority which he denies can be exerted. His averments, too, may be traversed, and issue being joined on the

traverse, must be decided in some way; and so his sovereignty denied by judicature. Neither can he plead in *abatement*, or any dilatory exception ; for he may be decreed to answer over. Neither may he *protest ;* for the question cannot be raised by a naked protest ; and if he couples his protest with an answer, if he does not so overrule his protest, his answer leaves him as before. If he adopts the practice pursued in the case of the *Cassius,*[a] and *suggests* his exemption upon the record, he will be met, as in that case, by a replication to his suggestion, and it becomes a mere plea in abatement ; for whatsoever one party may affirm, the other may deny.

These are the only known modes of *defenee*, and none of them can the foreign sovereign adopt, without abandoning the exemption claimed for him by the argument. What then must he do ? He must not defend himself in judicature at all. He must apply to the sovereign of that tribunal where his rights are drawn in question, and refer to his accountability. This sovereign, if he sees fit, will suggest for him ; if he does not, he will refuse to do so, and meet the consequences. To a suggestion coming from this quarter there can be no replication ; for he who makes it is no party in interest. Nor is proof necessary to establish it ; for it comes duly authenticated. Such was the course pursued in the memorable case of the *Exchange,*[b] where a suggestion of the sovereign rights of the Em-

a United States v. Peters, 3 *Dall.* 123.

b 7 *Cranch,* 116.

peror Napoleon was made by the executive go-
vernment; although proof of the commission of the
commander of the vessel was unnecessarily super-
added.   This is the only proper mode in which the
matter of sovereign right can, duly and orderly, be
set before the Court.   It avoids all the technical
difficulties of pleading and practice, and places the
matter where, according to the argument, it ought to
rest, with the sovereign.

This course has not, however, been adopted here;
and therefore the Court will not take judicial cogni-
zance of the fact of sovereign right, involved in the
determination of the cause: and the argument insist-
ed on, even if abstractly true, has no application to
the cause, as presented upon the record.   The matter
is reduced to a mere question of practice, settled by
the form of the pleadings, which it is now too late
to amend.

Suppose, however, it were *res integra*.  The Court
must contrive some proper form in which subjects of
this sort may be brought before it.   In adjusting this
form, it is a sound and a safe rule to be followed, to
attain the object by *known*, rather than by *untried*
means; to adhere to ancient forms, as far as may be
done; and, if possible, to alter nothing.   If this be
so, whatever may be the rule adopted by the Court,
the case will still be found exposed to the objection
before stated: for the record will not show any in-
formation derived from *our* sovereign, but the very
reverse.   It is only important then to examine the
question, whether the information of the sovereign
or executive government be the proper and only

standard to which the Court must refer, in matters wherein not our own people, but foreign states are concerned. Whatever the theory may be on this subject, all know that, in point of fact, Courts of justice do and must decide upon the rights of sovereigns, and that even in governments the most absolute. For these Courts must necessarily decide upon the rights of private individuals and corporations, and these are oft-times so interwoven with the rights of their sovereigns, that to decide upon the one, is to decide upon the other, not only in *form*, but *effect* also. Treaties and war create and destroy rights; and nations as well as individuals, derive their rights from these public transactions, which therefore the tribunals of justice must pass upon. Such, among many others, was the case of the *Amiable Isabella*, where the sovereign rights of Spain and the United States were involved, and were determined by this Court.[a] The rights of sovereigns must then be settled by Courts, and may be settled in different modes. This supposition constitutes a part of our complex system of government. Sovereign rights may be settled, not only in the Federal Courts, but in the State Courts: and to guard against the effects of a conflict of opinion in such cases between the different local tribunals, appeals are brought from the State Courts to this Court. It would be in vain, however, to translate a cause here from the State Courts, if this Court might decide it differently from the other departments of the government. This must not be, however. The

[a] 6 *Wheat. Rep.* 1. 50

people, although sovereign, can have but one will; and that will must be spoken by all their agents, or our government is a many-headed monster. The question, then, at last results in this: In what department of the government does this will, in relation to *foreign* states, reside? For wherever it does reside, that will must be uttered here, or we shall have two conflicting wills on the same matter. Now, I care not *where* it resides, if it resides any where: and the argument and necessity both prove that it must reside *somewhere.* If then it resides *here,* in this Court, the argument is radically defective: for then it follows that judicature may decide on sovereign rights. And if it resides not here, but elsewhere, it must be communicated from thence hither, and constitute the law of the Court; or our government is a monstrous anarchy. Some mode of communication between the executive government and the judiciary must be contrived. The only doubt is how this communication is to be made. And whatever course may be a proper one, none has been adopted in the present case, and the Court cannot therefore take notice that any sovereign rights of Buenos Ayres are involved in the cause. You cannot know the fact, and must proceed as if it did not exist. This does not impugn judicial independence. The judiciary are not independent of the law. They utter the legislative will of the people, when declared by the legislature: they pursue its executive will when communicated by the executive department. All nations have felt the necessity of some such course; the only question is as to the form, which must depend upon the municipal.

1822.

The
Santissima
Trinidad.

constitution and the practice of each particular country. Thus, in England all rights of prize are originally vested in the crown. Hence, the Courts of Prize take their law from the King's instructions. The captors cannot proceed to adjudication against the will of the crown. Hence, in the case of the Swedish convoy, the condemnation of the captured property for resistance to the exercise of the right of search was limited to the merchant vessels, although the same penalty would have been applicable to the convoying frigates, had not the crown interposed its prerogative, and from reasons of state, caused the latter to be restored to the foreign sovereign.[a]

Heretofore the subject has been examined as a technical question of pleading and practice merely. Let us now examine it as one of evidence. Of whom then is this exemption from judicial investigation affirmed? A sovereign state. But is Buenos Ayres a sovereign state?

This Court has repeatedly decided that it will not undertake to determine who are sovereign states: but will leave that question to be settled by the other departments of the government, who are charged with the external affairs of the country, and the relations of peace and war.[b] It may, however, be said that both the judiciary and the executive have concurred in affirming the sovereignty of the Spanish Colonies, now in revolt against the mother country.

a The Maria, 1 *Rob.* 340.

b Rose v. Himely, 4 *Cranch,* 241. 292. Gelston v. Hoyt, 3 *Wheat. Rep.* 246. 224. United States v. Palmer, 3 *Wheat. Rep.* 610. 634.

But the obvious answer to this objection is, that the Court, following the executive department, have merely declared the notorious fact that a civil war exists between Spain and her American Provinces; and this so far from affirming, is a denial of the sovereignty of the latter. It would be a *public*, and not a *civil* war, if they were sovereign states. The very object of the contest is, to decide whether they shall be sovereign and independent, or not. All that the Court has affirmed is, that the existence of this civil war gave to both parties all the rights of war against each other. But belligerent rights are not regalian rights. Now, in the case last cited,[a] the Court decided that the seal of this supposed sovereign state might be proved like any other matter *in pais*. If it were really a sovereign state, the seal would prove itself. The more the subject is examined, the more apparent will it be, what confusion and mischiefs must flow from the judicial department assuming the right to acknowledge the existence of her sovereignties, especially in the present mutable state of the world. Cases of depositions and restorations are continually occurring, of revolutions and counter-revolutions, which present the most complicated questions of strict right and political expediency, the determination of which must be left to the other departments of the government.

But if it were true, in fact, and well pleaded, that the *res* now in controversy is a sovereign's right; still, it would not be correct to say, that *all* sove-

---

[a] The United States v. Palmer, 3 *Wheat. Rep.* 635.

reign rights are exempt from judicial examination.
There must be some exceptions to the universality
of the rule. The exemption only applies to the re-
galian rights of the sovereign; those which are ne-
cessary to maintain his faith, dignity, and security,
and to none else. Such are his august person, his
ministers, his armies and fleets. These are protect-
ed from the interference of foreign judicatures, be-
cause they are essentially necessary for these pur-
poses; they make up sovereignty itself. And no-
thing else which is not within the reason, is within
the rule of exemption. Suppose a royal stag or
horse escapes into a foreign state, and is there sold
in market overt as an estray; or suppose the ship of
a foreign sovereign is wrecked on our coasts, and a
claim for salvage of the materials interposed. Would
you stay your hand from a dread of the sacredness
of the subject matter? The privilege of sovereignty
cannot protect these cases. No authority can be
shown to prove it; on the contrary, the authorities
are clearly the other way. Thus, all prizes made
in war are the property of the sovereign, *jure coronæ*,
and this, whether the prize be taken by a public or
a private ship. But it is not to be argued (in this
Court at least) that such prizes may not be taken
out of the hands of the captors (whose possession
is that of their sovereign) and restored by the neu-
tral tribunal, within whose jurisdiction they may
happen to come, if made by *privateers* in violation of
neutral territory or of neutral rights. And if so,
why may not prizes made by *public* ships be re-
stored under like circumstances? They both come

1822.

The
Santissima
Trinidad.

within the same reason, and, therefore, should fall within the same exception to the general rule. The rule, then, if true at all, must be limited as I have stated; and if so, it will not apply to the present case. It may, indeed, protect the public ship herself, but not her prize goods. These are not the regalian rights of the sovereign; they are a mere accidental, military possession, which are not indispensably necessary to maintain his faith, dignity, or security.

Again; the argument which asserts exemption for sovereign rights does not confine itself to the rights of a belligerent, but equally applies to all sovereigns, whether in peace or war. But if a wrong doing sovereign may claim this exemption, what becomes of the rights of the injured sovereign? Must he submit, or hold his hand, and ask redress of the offender? Every objection which applies to the one, exists in equal effect as to the other; and if the tort-feasor may not pursue this course, he must not, by his own act, constrain the injured party to adopt it. To guard against this conflict of dignities, the public law has wisely settled the rule, that each sovereign is supreme at home; all are equal on the high seas, except in war, and then the comity of nations, and the necessity of the case, refers it to the *arbitrium* of the captors. But this rule of comity protects not violators of the neutral territory, within which its sovereign is supreme; for the implied pledge given to a foreign state, of exemption from the local jurisdiction, is violated the moment it infringes our laws, treaties, and sovereign rights. The fiction of extra-

territoriality only applies to the peaceful observers of this implied pledge. The implication is repelled, and the pledge forfeited by abusing the rights of hospitality and asylum. This exception to the rule is recognized distinctly by the Court in the case of the *Exchange*,[a] and it was upon this ground that the Court has interfered in the whole class of captures made by means of illegal armaments in our ports.[b] The question in every one of these cases was not as to the character of the wrong doer, but as to the nature of the act done, and the *locus in quo*, it was committed. No inquiry was ever made whether the capturing vessel was public or private; but only whether our neutrality had been violated. And the principle to be extracted from them all is, that the neutral tribunal may properly restore any prize brought within its territory, which has been made in violation of neutral laws, or rights, or obligations. Within this principle the present case is found; and, therefore, it is not universally true, that the rights of sovereigns are exempt from judicial examination.

The argument we are discussing concedes, that the injured sovereign himself may restore, although it denies the power of making restitution to his Courts. But the effect to both parties is precisely the same, whether the restitution be made by sovereign or Court, as has been already shown. Still, granting that it may be done by the sovereign only;

a 7 *Cranch*, 116.

b The Divina Pastora, 4 *Wheat. Rep.* 52. and cases collected in note *a. Ib. p.* 65.

who is sovereign here, *quoad hoc?* It must be the judiciary : since wherever individual rights are involved, whether arising under war, or treaty, or municipal regulations, the judiciary in this country must decide.[a]   Where indeed no case is made upon which the judiciary can act, then the executive may interfere, as it did in the commencement of the European war in 1793, in the case of the *Grange.* But even here the genius of our institutions requires, that the preliminary inquiry should be made through the judiciary, which is the proper tribunal to make such examinations, in which private rights are for the most part involved.  Such was the course pursued in the case of *Thomas Nash* alias *Robbins.*   The parties, one of whom was the king of Great Britian, could not appear in Court ; the executive acted therefore by judicial means, and the facts being judicially ascertained, it proceeded to carry into effect the treaty.[b] If then the sovereign must submit to his co-equal sovereign, as the argument concedes, and the judiciary is invested with this portion of sovereignty, the case is clear, and the argument has no application to it.  Nor does this reasoning exclude the executive action, but yields to it in every instance where no case is made adapted for judicial determination ; and even where such a case is made, the executive may interpose by *suggestion,* by which the Court will be bound as they would by an act of the legislature in a case fit for the exertion of legislative power.

a  See 3 *Dall.* 13.

b  Speech of Mr. now Chief Justice) MARSHALL, 6 *Wheat.* *Rep. Appx.*

1822.

The
Santissima
Trinidad.

But suppose the judiciary not to be sovereign as to this matter. Yet, whoever be the sovereign, as to it, he need not act directly ; but may delegate his power of decision and action to another : still it is the sovereign who acts. If the executive be sovereign, this delegation is effected by *suggestion*, or the want of it, as the case may be. If he means that the judiciary should decide for him in a particular way, he suggests it. But if he is content to take the lead from the judiciary, and to adopt its construction, he declines to suggest. In the latter case, the judiciary acts according to the sovereign will, because he adopts theirs. In the former, the same thing is effected, for the judiciary adopt his. By this means that harmony is produced which can be effected by no other.

But if it be thought that the legislature is the true sovereign, *quoad hoc*, then the legislative will has been distinctly expressed in the Neutrality Act of 1794, c. 226. It is in vain to contend that this statute does not apply to public or national ships. For not only are its terms sufficiently copious to embrace *any* ship, but their context plainly shows that they were designed to apply especially to such ships. Here the learned counsel analyzed the act, in order to show that it extended to public, as well as private armed ships ; and insisted that this construction was confirmed by the consideration that both the cases were equally within the mischief intended to be provided against, which was the violation of our own territory, and of neutral relations and obligations. Nor was there any weight in the argument which

would confine the authority of the Court under the act to captures made within our territorial jurisdiction. For although the 6th section expressly gives cognizance over that class of cases, the history of the law on the subject plainly proves that this was merely an affirmative position, and was not meant as an exclusion of judicial authority in other cases. The provision was meant to define the territorial jurisdiction of the Union, and to settle a supposed doubt with the Courts, which did not exist in fact. It was therefore merely declaratory of the law in that case, and could not be intended as a restriction upon the general authority of the Courts. If this were not so, what would become of the cases, occurring before this statute was passed? or of the numerous cases since decided, of captures *without* our limits, by means acquired *within* them? This series of adjudications manifestly shows that the Courts exercise their power independently of the statute, the sole effect of which is (of the 6th section at least) to recognize an existing authority in a particular case, and not to limit it to that case only.

But even if this be not so, what is a capture within our waters? Is it not to all legal purposes made within our territory, when the captor is within and the prize without, the potential force being exerted within? or where the actual force is exerted without, by boats sent from within? And if so, it proceeds solely on the ground that the *locus in quo* is to be fixed, not by the place of seizure, which in both the supposed cases is without, but by the source from whence the exerted force proceeds. Consequently, a capture

made actually on the high seas, by means acquired here, is a capture within our territory.

It is clear then, upon principle, that the property even of a sovereign acquired in war, within a neutral territory, or by means therein illegally obtained, may be subjected to judicature, and restored: and this whether the prize is made by a public or a private cruizer. Nor is the dignity of sovereigns injuriously affected by such a proceeding, which being *in rem*, the sovereign is not constrained to defend himself before the Courts of justice, but may properly apply to the other sovereign for redress, by whose suggestion, duly made, the judiciary must be bound.

That which is thus clear upon principle is equally established by authority. In the history of transactions of this nature, it will be found, that wherever the neutral state interferes to vindicate its own neutrality, no distinction is made whether that neutrality be infringed by a public or a private ship.[a] Both

1822.<br>The<br>Santissima<br>Trinidad.

a *Lee on Capt.* 116. 121. 123. edit. of 1803. " In the year 1654, a captain of a *Dutch man-of-war* met with an English ship at sea, running into the port of Leghorn, and seized her even when she was coming to anchor ; the Duke of Tuscany complained of this to the States General, but without redress. He, however, showed his resentment of it by *condemning the ship which had taken the Englishman.*" *p.* 121.

This book, (*Lee on Captures*,) which is called in the preface, " an enlarged translation of the principal part of Bynkershoek's *Quæstiones Juris Publici*," is in fact little more than a very poor translation of that treatise. In the original text of Bynkershoek, it by no means appears that it was a *public* ship which had taken the Englishman in a neutral port. His words are : " Ex factis, quae postea inciderunt, etiam haec videntur

1822.

The
Santissima
Trinidad.

France and England restore the property of their subjects found on board of prize ships sent into their ports by the vessels of other powers, and that whether the capturing vessels are public or private.[a] During the beginning of the war of the revolution, the prizes sent into France by the *Alliance* frigate were restored by the tribunals of that country, if the property of her friends. In the case of the Swedish convoy, in the English High Court of Admiralty, the crown declined proceeding against the Swedish frigates, as has been before mentioned; otherwise, Sir W. Scott declared, that he would have con-

probasse Ordines Generales ; quum enim anno 1654, *Navarcha Hollandus* navem Anglicam, in mari deprehensum et ad portum Liburnensem fugientem, occupasset, etiam tunc, cum navis Anglica jam funem in terram projecerat, Dux quidem Tusciæ ea de re questus est ad Ordines Generales, sed nequicquam questum esse legimus. Vide tamen, an non ipse dux id postea vindicaverit ; publicata nempe nave, quae opportunitatem proebuerat occupandae istius Anglicae. (*Q. J. Pub. l.* 1. c. viii. *p.* 64. *Edit. Lugd. Batav.* 1752.) which Mr Duponceau, in his elegant and accurate translation, thus renders : " From facts which afterwards took place, the States General appear to have approved thus much ; for when in the year 1654, a *Dutch commander* met an English vessel on the high seas, and pursued her flying into the port of Leghorn, where he took her at the moment she was coming to anchor, the Grand Duke of Tuscany complained of it to the States General, but we read that he complained in vain. He, however, afterwards, took satisfaction by condemning *the Dutch vessel* that had made the pursuit and occasioned the capture of the English one." *Duponceau's Bynk. p.* 63.

a *Ord. de la Mar. Art.* 9. *Des Prises,* 15. 2 *Sir L. Jenkins' Life,* 780.

demned even those public ships.[a] But how could he, unless they were subject to judicature ? It may be said, that they were regarded as *qua* belligerent, having forfeited their neutral character by attempting a resistance to the right of search. Be it so. Then we may, *vice. versa*, condemn a public ship, or her prizes, for unneutral conduct, by which they lose their extra-territorial character conferred on them by a fiction which ought no longer to be regarded than it subserves the purposes of justice. There are numerous examples to show that there is nothing so sacred in the rights of sovereigns as to prevent judicature from dealing with them, both directly and incidentally. In the case of *Duckworth* v. *Tucker*, the sovereign rights of Portugal were determined by the English Court of C. B., in a private controversy between two British Admirals about prize money.[b] In the *Canton of Berne* v. *The Bank of England*, that state appeared as an actor in the High Court of Chancery, which had the control of the fund, which the government of Berne laid claim to, as a part of its public treasure.[c] As to the case of the *Exchange*, in this Court, it must be repeated that it does not go on any extravagant notion of the exemption of sovereign rights from judicial scrutiny ; but on the ground of preserving the national faith, and that the ship entered under the pledge of an implied license which she had not forfeited by any misconduct. Had she done so, she

1822.

The Santissima Trinidad.

a 1 *Rob.* 377.     b 2 *Taunt.* 33.     c 9 *Ves.* 347.

would have been condemned as unhesitatingly as the most insignificant privateer. It is only necessary to recur to the case of the *Cassius,* a public armed ship of the French republic, and to the words used by the Court respecting that case in the *Invincible,*[a] to show that it never has recognized any distinction in this respect between public and private armed ships.

The learned counsel then proceeded to examine the testimony in the cause, to show that it clearly established the fact of an illegal outfit and augmentation of force, by the capturing vessels in our ports ; and, lastly, answered the argument attempted to be drawn from the alleged condemnation at Buenos Ayres, by stating, that the decree was not established in proof, and that if it were so, it could not avail as a bar to the present proceedings, as the property was at the time in the custody of our Court, and had been actually sold by consent of the claimant who now sets up the decree in the foreign tribunal.

Mr. *Webster,* on the same side, (1.) argued, that there was no force in the general objection set up by the captors, that the ship which made the capture being a public ship ; we could not examine into her acts, because it would be to interfere with the sovereign rights of the state to which she belongs. He denied that there was any such general principle, and no book, or case, or even *dictum* could be found to

a 1 *Wheat. Rep.* 253.

support it. Judicature deals with sovereign rights perpetually, in our Courts, in England, and in every country, and in every case where the government is a party to the suit. Is it meant that judicature cannot deal with sovereign rights, neither domestic nor foreign? All history shows the contrary. If it were so, no sovereign could come into Court. The great political powers of government, as those of peace and war cannot indeed be submitted to judicial decision; but proprietary interests, in which the public are concerned, are settled every where by the tribunals of justice, as in the familiar instances of inquests of office, and writs of intrusion. So an ejectment may be brought for the crown lands, the most favourite fief. And nothing can be more sovereign than the right of prize, *jure belli;* it is a great branch of the prerogative; yet every body may contest it, and the king must claim, and if he cannot make out a title he must lose it. Any jewel in any king's diadem may become the subject of judicial discussion. The extent and rights of the prerogative are discussed in every Court in England; and all the powers of this government are discussed in this Court, and in all the State tribunals. The government of the United States, and of the States, are sovereign, and cannot be sued; but in a contest between individuals or corporations, the sovereign rights of the Union and the several States may be decided.

Judicature may then deal collaterally with sovereign rights, and wherever the sovereign himself is *actor;* wherever he brings the suit. The true pro-

1822.

The Santissima Trinidad.

position, therefore, must be, that the Prince cannot personally be sued in his own Courts, or in foreign tribunals. As to the domestic forum, two reasons are given why the king cannot be summoned or arrested in any civil or criminal suit. The first is, his supereminency ; and the second, that justice is administered by him, and in his name.

These reasons do not apply to a foreign country. He has no supremacy there, nor is justice administered in his name. Sovereignty is local ; and when the sovereign transcends the limits of his land, he transcends the limits of his prerogative. The reason why he is not amenable to the foreign tribunal grows out of international law, and does not spring from the municipal code. It is not for want of jurisdiction ample enough to reach him ; but that having come into the territory of another sovereign, under his permission, either express or implied, it would be a violation of the public faith to subject his person to any kind of restraint. The same immunity is extended to his ambassador, for the same reason ; and to support this immunity, the fiction of extra-territoriality has been invented, and applied to the cases of the army, or navy, or single ship of a sovereign coming into the territory of another. Being there under the license of the local sovereign, they are at liberty to remain and depart unmolested. Not that the foreign sovereignty exerts itself within the territory of another state, but that the local sovereignty is suspended from motives of comity, and a regard to the plighted faith of the nation. The exemption probably extends even to private merchant

1822.

The
Santissima
Trinidad.

vessels; which proves clearly that it does not rest on any right of sovereignty. But the permission may be withdrawn both as to these, and as to public vessels, if the indulgence be abused to the injury of the power by which it is granted. No neutral nation is *bound* to admit the belligerent ships of war within its waters, unless under treaty stipulations; and it may concede the privilege on such terms and conditions as it thinks fit. The presumption or fiction under which the license was granted ceases, the moment the license is revoked; and the license is revoked as soon as the terms and conditions on which it was granted are violated. Still less can a mere general permission to the ships of a foreign state to come into our waters, be construed into a license to violate our laws, and treaties, and neutral obligations. Nor is it necessary here even to contend that the ship herself is subject to the local jurisdiction. We proceed against her prize goods, found within our territory. It is alleged, that they are held by the right of a foreign sovereign, or under a sovereign, and it is impossible to avoid inquiring into the foundation of this right. It is the inherent vice of the opposite argument, that it concedes this position; and in making that concession it yields the inevitable corollary that this sovereign right is not exempt from judicature.

2. If we proceed then to examine into the foundation of the right, we shall find that the Spanish consul here claims, in behalf of his fellow subjects, their property, which has been taken from them by a cruizer sailing under the flag of the enemy of Spain,

but equipped in our ports, and manned with our citizens, contrary to our municipal laws and the 6th and 14th articles of our treaty with Spain. The true interpretation of the 6th article raises our national duty, wherever a capture is made by our citizens of Spanish property, which is afterwards brought within our jurisdiction. We are to endeavour to protect the vessels and effects of Spanish subjects which *shall be within the extent of our jurisdiction* by sea or by land," as an act distinct from that of using our " efforts to recover and cause to be restored to the right owners their vessels and effects which *may have been taken from them within the extent of said jurisdiction*." It is a reciprocal duty of both states, and without invoking the aid of this article, we should find it difficult to maintain our claim upon Spain for the property of our citizens carried into her ports by French cruizers, and condemned by French tribunals within her territory. As to the 14th article, it is pretended that it attaches a mere personal penalty to the offending party, and operates merely to abandon our citizens, who may violate it, to be punished as pirates at the will of Spain. But the mutual prohibition to the citizens or subjects of each power from taking commissions to cruize against the other makes such conduct unlawful to every intent and purpose. The penalty of being punished as pirates is merely superadded as a consequence which would not necesssarily have followed from the prohibition without a special provision to that effect. But the invalidity of the captures made under a commission thus unlawfully taken is a neces-

sary and inevitable consequence of the prohibition it-
self. This article cannot therefore be considered as
merely monitory : the words are promissory ; they ex-
press the undertaking of the two governments and
their reciprocal duty. Nor is it confined to captures
made by private armed vessels. It is true that the first
clause of the article speaks of " any commission or let-
ters of marque, for arming any ship or ships *to act as
privateers.*" But in the Spanish counterpart of the
second clause, these last words *que obren como corsa-
rios* are dropped, although they are retained in the
English. The Spanish counterpart speaks generally
of " *patente para armar* ALGUN BUQUE ô BUQUES *con el
fin de persequir los subditos de S. M. catolica,*" which
obviously extends to public as well as private cruiz-
ers. As to our municipal laws, they are not confin-
ed to acts done within the limits of the United States.
They are full of provisions making it unlawful for
our citizens (without those limits) to fit out and arm,
or command and enter on board of, a foreign cruizer
intended to be employed against powers in amity with
us.[a] Whether, therefore, the offence in this case
was committed within or without the United States,
the illegal equipment or augmentation is within the
statutes, and consequently the property acquired un-
der it must be restored to the true owners.

3. What gives additional strength to this national
obligation, is the fact that the claimant in the present
cause, and those for whom he claims as captors,

1822.

The
Santissima
Trinidad.

a *Act of* 1797, *c.* 1. *Act of* 1817, *c.* 58. *s.* 2. *Act of* 1818,
*c.* 83. *s.* 4. *s* 10.

are citizens of the United States, who claim a title to property acquired in violation of the laws and treaties of their own country, in a Court of that country.

But it is said that the claimant, Chaytor, has ceased to be a citizen of this country by what is called an act of *expatriation*, (but which ought rather to be called *emigration*,) and has become a citizen of Buenos Ayres. Now it cannot, and certainly ought not to be denied, that men may remove from their own country in order to better their condition, or to avoid civil and religious persecution. But it does not follow that under all circumstances, and for all possible reasons, a person may shake off his allegiance to the land which gave him birth. The slavish principle of perpetual allegiance growing out of the feudal system, and this fanciful novelty of a man being authorized to change his country and his allegiance at his own will and pleasure, are both equally removed from the truth on this subject. Whatever doubtful cases may be supposed, this much may be affirmed with certainty. that there must be an actual change of the party's domicil, and that this must be done, not merely with the intention of remaining in his adopted country, but it must not be coupled with a design fraudently to evade the laws of his native country. No act whatever of a foreign government can dispense with the allegiance of a citizen, and authorize him to violate our penal code or our treaties with other nations. This is a prior, paramount obligation, which must be first fulfilled, before he assumes any new and inconsistent duties. Even if there had been, in this case, an actual *bona*

*fide* change of domicil, *animo manendi,* so as to enti-
tle the claimant to all the privileges of commercial
inhabitancy under the law of prize or the revenue
laws, it does not follow that he can with impunity
levy war against the United States or their friends.
And even if it be admitted that he might defend his
adopted country, it does not follow that he may attack
his native country, or those whom she is bound to
protect. Can it be sufficient to legalize such an act
that he has made his election, and that the foreign
government has ratified it ? Is it not manifest that it
was done, *cum dolo et culpa,* for no other purpose
than to evade and violate our laws ? In this respect,
it is impossible to distinguish between the neutrality
acts, and other laws, such as the statutes of treason,
or any other the most intimately connected with the
national safety and existence. But it is unnecessary
to dwell upon this point, as it is the settled doctrine
of this Court, that a citizen of the United States can-
not claim in their Courts, the property of foreign na-
tions in amity with them, captured by him in war,
even if the capturing vessel be in other respects law-
fully equipped and commissioned ;[a] and that an act
of expatriation cannot be set up to justify such a cap-
ture, where the removal from his own country was
with the fraudulent intent of violating its laws.[b]

Even admitting that foreign armed vessels may,
in the absence of any express prohibition, enter our
ports for the purpose of refreshment, or of making
repairs, and will not thereby be subject to the local

a The Bello Corrunes, 6 *Wheat. Rep.* 152. 169
b Talbot v. Janson, 3 *Dall.* 133. 153. 164.

law and judicature, it does not, therefore, follow that they may make extraordinary repairs so as to be transformed in the species. The implied license may extend to a mere replacement of the original force; but it cannot extend to such an augmentation of the force as would be inconsistent with the neutral character of the power granting the license. It cannot extend to acts done subsequent to the vessel entering the neutral port; in other words, to a violation of the license itself. The vessel may remain in the same condition as she came, but she may not increase her capacity for war by the addition of neutral means, either in munitions or men. Nor does it follow, in any supposable case, that because the capturing ship herself cannot be made answerable to the jurisdiction of the local tribunals for violating the laws and treaties of the neutral state, that her prizes are entitled to a similar exemption. They do not stand on the same principle or reason. The ship of war ought not to be detained from the public service of the sovereign to whom she belongs. Neither his dignity nor safety will permit it. But neither the prize vessels or goods captured by her are necessarily connected with his military power.

5. As to the facts of the illegal equipment and augmentation of the force of the capturing vessels in our ports, they are sufficiently established by the testimony. Although there may be some discrepancies in their evidence as to certain immaterial circumstances; yet, as they all concur in proof of the material facts, and their testimony is uncontradicted even by the claimant's witnesses as to some of the

most important, they are entitled, in this respect, to credit. Their testimony, taken in connection with the *res gesta*, which are admitted on all hands, satisfies the rule which the Court has laid down in this class of causes, that the fact of illegal equipment in violation of our neutral duties, must be proved beyond all reasonable doubt.

6. Lastly: As to the pretended condemnation at Buenos Ayres. Independent of the objection which has already been stated to it, the question which has been here raised as to the capture having been made by military means obtained within our neutral territory, could not possibly have occurred in the course of the prize proceedings in the Court of the belligerent state. The goods being confessedly the property of its enemy, and liable to capture and condemnation as prize of war, the plea that the capture was made in violation of our neutrality could not be set up by the Spanish owner. Being an enemy, he had *no persona standi in judicio* for that purpose. The government of the United States must have interposed a claim upon this ground, or have authorized the Spanish claimant to interpose it. Unless this were done, the goods were clearly liable to condemnation as prize of war, as they would be in the analogous case of a capture actually made within the neutral territory itself; where, unless the objection is made by authority of the neutral government, it cannot be made by the enemy owner, who, in his character of enemy, is not injured by it. We need not, therefore, directly impeach the validity of the condemnation at Buenos Ayres, so far as the rights

of the two-belligerents merely are concerned. We only repudiate the claim of one of our own citizens, who comes into our Court, and sets up the foreign sentence, which was obtained by him in fraud of our laws, as an excuse for the violation of those laws. To the Prize Court of Buenos Ayres it was sufficient that, as captor, he had a right to stand upon his commission issued by that state, and to insist upon the condemnation of his prize taken *jure belli*. But in this Court that very commission disables him from claiming any title acquired under it, for reasons which could not be urged in the Prize Court of Buenos Ayres, where the Spanish owner could not appear at all unless by authority of the government of the United States. It is not, therefore, a *res adjudicata*. Nor is the claimant a *bona fide* purchaser of the prize goods, ignorant of the fraudulent and illegal conduct of the party by whom they were captured and sold to him. The claimant, Chaytor, is himself that party, and he can no more set up the sentence of condemnation for his protection, than he can the pretended act of naturalization to cover his crime in confederating with one of the belligerents to violate the laws, and treaties, and most solemn obligations of his own country.

Mr. *D. B. Ogden*, for the appellant, in reply, stated that he should, for the purposes of the argument, take it for granted that the capturing vessel, the Independencia, was in point of fact a public ship belonging to the government of Buenos Ayres. The flag and commission are conclusive evidence of that fact.

It is contended, on the other side, that the Court is bound to interfere and restore the captured property, to the original Spanish owners, because it is said that, though the rights of a sovereign are involved, yet as he cannot appear in a Court of justice to claim, these rights must be determined without hearing one of the parties, who is most materially interested in asserting them. And it is said, that the foreign sovereign must state his claim to the executive government, and that it must be brought to the notice of the Court by a suggestion from the latter. So that according to this doctrine, the Courts of this country, could never listen to the complaints of foreign states, who had no minister to represent them here; and their property may be condemned, and their most sacred rights violated, without their being present, or heard. But we never meant to contend, that sovereign rights could not be discussed and determined in a Court of justice, and that this suit could not be maintained, because the sovereign rights of Buenos Ayres might be incidentally drawn in question: but because this was a public armed ship of that state, coming into our waters, with her prize goods, under the express or implied permission of our government; and while here she was exempt from the jurisdiction of the local tribunals.

But we are told that Buenos Ayres has not yet been acknowledged by the government of this country as an independent state; that she is a mere revolted colony of Spain, and her cruizing vessels cannot be entitled to the privileges and immunities of the public ships of an old established sovereignty. The answer to this position is, that

1822.

The
Santissima
Trinidad.

though the independence of the South American provinces has not yet been acknowledged by our government, the existence of a civil war between these revolted colonies and the mother country has been acknowledged, and this Court has followed the executive government in considering them entitled to all the rights of war against their enemy. Such is the consequence which the writers on the law of nations attribute to a civil war between two portions of an empire. It is assimilated to a public war. They are belligerents in respect to each other; and all other powers, who take no part in the contest, are bound to all the duties of neutrality towards both. Whether, therefore, Buenos Ayres be a sovereign state, in the strict sense of the term, is quite immaterial for the present purpose. It is sufficient that she is a belligerent entitled to use against her enemy every species of military means. Among these, are the armed and commissioned ships of war, sailing under the public authority of that country, and admitted into the ports of this, with the same privileges as are enjoyed by the national ships of Spain. Being at war, the colonies are belligerents, and as belligerents they are entitled to all the rights of war, and we are bound to all the correspondent duties of the neutrality we profess to maintain. In the case of the *U. S. v. Palmer*[a] this Court lays down the principle that " when a civil war rages in a foreign nation, one part of which separates itself from the established government, the Courts of the Union must view

*a 3 Wheat. Rep.* 636.

such newly constituted government, as it is viewed by the legislative and executive departments of the government of the United States. If the government of the Union remains neutral, but recognizes the existence of a civil war, the Courts of the Union cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy." Why can they not consider these acts of hostility as criminal? Because war authorizes them, and they are directed by the new government against its enemy? In other words, because they are lawful: And if they are lawful for one purpose, it is difficult to understand how they can be unlawful for any other. If these acts are authorized by the laws of war, they must produce all the consequences of legal acts. They must vest a good title, *jure belli*, in the prizes taken by authority of the new government from its enemy. And that this is the necessary consequence of the principle is apparent from the words used by the Court in the *Divina Pastora*,[a] which was itself a case of prize, and where the proprietary interest acquired in war came directly in judgment. The Court there says, that " the government of the United States having recognized the existence of a civil war between Spain and her colonies, but remaining neutral, the Courts of the Union are bound to consider as lawful those acts, which war authorizes, and which the new governments in South America may direct against their enemy." Here the question was not, whether the

a 4 *Wheat. Rep.* 52.

existence of the civil war would excuse from tne penalties of piracy those who might act under the authority of the new government, but whether a capture made under that authority was valid by the law of nations. So, also, in the case of the *Estrella*,[a] the validity of the commission was explicitly recognized by the Court, and of course the authority of the government by whom it was issued was admitted.

In the case now in judgment, it is insisted, on the part of the respondent, that the Court is bound to restore the property to the original Spanish owner, by the true construction of the treaty of 1795. As to the 6th article, it is certainly a very forced interpretation, which makes it imply our duty to restore all Spanish ships and goods which may happen to be found within our territory, although the title may have been changed by a previous capture, *jure belli*, on the high seas. The article is evidently confined to wrongful acts done within our territorial limits. We are " to endeavour to protect the vessels and effects of Spanish subjects which shall be within the extent of our jurisdiction," but we are not to restore vessels and effects which have ceased to be Spanish by a lawful capture in war, without the extent of our jurisdiction. Nor have the United States insisted upon such an interpretation of the article as against Spain. We claim indemnity from Spain for condemnation of our vessels and effects by the French consuls in her ports, because to exercise the authority of a prize tribunal, is the highest act of sovereignty, and Spain having permitted it to be done by foreigners within her territory, it is the same thing as if her

*a.* 5 *Wheat. Rep.* 298.

own national tribunals had inflicted the wrong. The provision in this article is merely declaratory of the pre-existing law of nations, which always considers every sovereign as bound to protect the property of his friends within his territorial jurisdiction, and as responsible for whatever injuries he permitted to be there inflicted upon them. As to the 14th article, it is manifestly confined to privateers, and was not intended to extend to the case of a person entering the public military, or naval service of one of the contracting parties to commit hostilities against the other, and still less to authorize the seizure of a public ship of war or her prizes. This article was evidently intended to abridge a pre-existing right; and that it was a pre-existing right appears from the uniform practice of the whole civilized world. But it is confined in its terms to privateers and letters of marque, and by no fair rule of construction can it be extended to public ships.

Nor is the Court bound to restore, because the claimant, Chaytor, is a citizen of this country, and has violated its laws. Here the learned counsel entered into a minute analysis of the Neutrality Acts, to show that they were merely penal against the party, or the capturing vessel. But here the penalty would begin and end with the person of the captor, for the capturing vessel being a public ship belonging to a foreign state, she could not be forfeited without its being considered an act of reprisals in the nature of war against that state. Once being admitted with her prizes into our ports, she may remain as long as the executive government thinks proper to allow it

1822.

The
Santissima
Trinidad.

In this respect there is no distinction between the public ship herself and her prizes. Here the prize goods taken by her from the enemies of the state, under whose commission she was cruizing, were landed and deposited in the custom house stores, by the express permission of the government. It is novel doctrine that prize ships and prize goods are no part of the regalian possessions of a sovereign. They may be, and frequently are, absolutely necessary to his safety. They may be the principal means by which he is enabled to carry on the war, and a chief source of his revenue. How is it, then, that they are not equally exempt from the jurisdiction of the local tribunals, with the guns, and spars, and rigging of the ship herself, which may be landed in the same manner for the purpose of making repairs? Are they not brought within the territory under the same permission, express or implied? If an army had a right of passage through a neutral territory, can it be doubted that it would extend to its military chest, and its booty previously acquired? If the fiction of extraterritoriality will protect the ship, which is the principal, why will it not protect the prize goods which are the incidents? The permission to enter may, indeed, be qualified by any condition the neutral state thinks fit to impose; such, for example, as that contained in the law of France, that prize goods which may have been taken from the subjects of the state or its allies should be restored. But this Court has expressly repudiated that principle in the case of

the *Invincible*,[a] and it is for the executive and legislative departments to impose such restrictions as they think fit upon the admission into our ports of armed vessels, public or private, with their prizes. In the case of the *Exchange*, which has been so often referred to, the Court in summing up its opinion says : " It seems, then, to be a principle of public law, that national ships of war, entering the ports of a friendly power open to their reception, are to be considered as exempted by the consent of that power from its jurisdiction." The ship herself being exempted from the local jurisdiction, she remains a part of the territory of her own country, and if she brings in with her prize ships, or prize goods, they are to be considered as in the possession of that country. That they are so, is apparent from the established doctrine of this Court, that prize ships or goods, though lying in a neutral territory, may be condemned in a competent Court of the belligerent state, by whose cruizers they were captured. Indeed, the writers on the law of nations expressly state the privilege of bringing in their prizes to be a part of the permission.[b] But how can this be if the immunity does not extend to every thing on board ? Here the goods were taken *jure belli*. Whether they are good prize depends upon the adjudication of the captor's Court, which is the only competent tribunal to determine that question. They are in his possession for the purpose of proceeding to adjudication,

1822.

The
Santissima
Trinidad.

a 1 *Wheat. Rep.* 238.
b *Vattel, Droit des Gens, l.* 3. *c.* 7.

even while they are locally within the neutral territory. Either the condemnation at Buenos Ayres is a sufficient adjudication, or not. If it be so, then the appellant is entitled to the goods under it. If it be not, still he is entitled to the possession of the goods, in order that he may proceed against them in the most regular manner, which he has been hitherto prevented from doing by this very suit.

*March 12th.* Mr. Justice STORY delivered the opinion of the the Court.

Upon the argument at the bar several questions have arisen, which have been deliberately considered by the Court ; and its judgment will now be pronounced. The first in the order, in which we think it most convenient to consider the cause, is, whether the Independencia is in point of fact a public ship, belonging to the government of Buenos Ayres. The history of this vessel, so far as is necessary for the disposal of this point, is briefly this : She was originally built and equipped at Baltimore as a privateer during the late war with Great Britain, and was then rigged as a schooner, and called the Mammoth, and cruized against the enemy. After the peace she was rigged as a brig, and sold by her original owners. In January, 1816, she was loaded with a cargo of munitions of war, by her new owners, (who are inhabitants of Baltimore, and being armed with twelve guns, constituting a part of her original armament, she was despatched from that port, under the command of the claimant, on a voyage, ostensibly to the Northwest Coast, but in reality to Buenos Ayres.

By the written instructions given to the supercargo on this voyage, he was authorized to sell the vessel to the government of Buenos Ayres, if he could obtain a suitable price. She duly arrived at Buenos Ayres, having exercised no act of hostility, but sailed under the protection of the American flag, during the voyage. At Buenos Ayres the vessel was sold to Captain Chaytor and two other persons ; and soon afterwards she assumed the flag and character of a public ship, and was understood by the crew to have been sold to the government of Buenos Ayres ; and Captain Chaytor made known these facts to the crew, and asserted that he had become a citizen of Buenos Ayres ; and had received a commission to command the vessel as a national ship ; and invited the crew to enlist in the service ; and the greater part of them accordingly enlisted. From this period, which was in May, 1816, the public functionaries of our own and other foreign governments at that port, considered the vessel as a public ship of war, and such was her avowed character and reputation. No bill of sale of the vessel to the government of Buenos Ayres is produced, and a question has been made principally from this defect in the evidence, whether her character as a public ship is established. It is not understood that any doubt is expressed as to the genuineness of Captain Chaytor's commission, nor as to the competency of the other proofs in the cause introduced, to corroborate it. The only point is, whether supposing them true, they afford satisfactory evidence of her public character. We are of opinion that they do. In general the commission of a public ship, signed

1822.

The Santissima Trinidad.

The commission conclusive proof of the national character of a public ship.

by the proper authorities of the nation to which she belongs, is complete proof of her national character. A bill of sale is not necessary to be produced. Nor will the Courts of a foreign country inquire into the means by which the title to the property has been acquired. It would be to exert the right of examining into the validity of the acts of the foreign sovereign, and to sit in judgment upon them in cases where he has not conceded the jurisdiction, and where it would be inconsistent with his own supremacy. The commission, therefore, of a public ship, when duly authenticated, so far at least as foreign courts are concerned, imports absolute verity, and the title is not examinable. The property must be taken to be duly acquired, and cannot be controverted. This has been the settled practice between nations ; and it is a rule founded in public convenience and policy, and cannot be broken in upon, without endangering the peace and repose, as well of neutral as of belligerent sovereigns. The commission in the present case is not expressed in the most unequivocal terms ; but its fair purport and interpretation must be deemed to apply to a public ship of the government. If we add to this the corroborative testimony of our own and the British Consul at Buenos Ayres, as well as that of private citizens, to the notoriety of her claim of a public character ; and her admission into our own ports as a public ship, with the immunities and privileges belonging to such a ship, with the express approbation of our own government, it does not seem too much to assert, whatever may be the private suspicion of a lurking American

interest, that she must be judicially held to be a public ship of the country whose commission she bears.

1822.

The Santissima Trinidad.

There is another objection urged against the admission of this vessel to the privileges and immunities of a public ship, which may as well be disposed of in connexion with the question already considered. It is, that Buenos Ayres has not yet been acknowledged as a sovereign independent government by the executive or legislature of the United States, and, therefore, is not entitled to have her ships of war recognized by our Courts as national ships. We have, in former cases, had occasion to express our opinion on this point. The government of the United States has recognized the existence of a civil war between Spain and her colonies, and has avowed a determination to remain neutral between the parties, and to allow to each the same rights of asylum and hospitality and intercourse. Each party is, therefore, deemed by us a belligerent nation, having, so far as concerns us, the sovereign rights of war, and entitled to be respected in the exercise of those rights. We cannot interfere to the prejudice of either belligerent without making ourselves a party to the contest, and departing from the posture of neutrality. All captures made by each must be considered as having the same validity, and all the immunities which may be claimed by public ships in our ports under the law of nations must be considered as equally the right of each; and as such must be recognized by our Courts of justice, until Congress shall prescribe a different rule. This is the

During the existence of the civil war between Spain and her colonies, and previous to the acknowledgment of the Independence of the latter by the United States, the colonies were deemed by us belligerent nations, and entitled to all the sovereign rights of war against their enemy.

doctrine heretofore asserted by this Court, and we see no reason to depart from it.

The next question growing out of this record, is whether the property in controversy was captured in violation of our neutrality, so that restitution ought, by the law of nations, to be decreed to the libellants. Two grounds are relied upon to justify restitution : *First*, that the Independencia and Altravida were originally equipped, armed, and manned as vessels of war in our ports ; *Secondly*, that there was an illegal augmentation of the force of the Independencia within our ports. Are these grounds, or either of them, sustained by the evidence ?

If the cause stood solely upon the testimony of the witnesses who have been examined on behalf of the libellants, we should have great hesitation in admitting the conclusions which have been drawn from it. The witnesses, indeed, speak directly and uniformly either to the point of illegal equipment, or illegal augmentation of force within our ports. But their testimony is much shaken by the manifest contradictions which it involves, and by declarations of facts, the falsity of which was entirely within their knowledge, and has been completely established in proof. It has been said, that if witnesses concur in proof of a material fact, they ought to be believed in respect to that fact, whatever may be the other contradictions in their testimony. That position may be true under circumstances ; but it is a doctrine which can be received only under many qualifications, and with great caution. If the circumstances

The doctrine that if witnesses concur in proof of a material fact, they ought to be believed in respect to that fact, whatever may be the other contradictions in their testimony, ought to be received under many qualifications, and with great caution.

respecting which the testimony is discordant be immaterial, and of such a nature, that mistakes may easily exist, and be accounted for in a manner consistent with the utmost good faith and probability, there is much reason for indulging the belief that the discrepancies arise from the infirmity of the human mind, rather than from deliberate error. But where the party speaks to a fact in respect to which he cannot be presumed liable to mistake, as in relation to the country of his birth, or his being in a vessel on a particular voyage, or living in a particular place, if the fact turn out otherwise, it is extremely difficult to exempt him from the charge of deliberate falsehood ; and Courts of justice, under such circumstances, are bound, upon principles of law, and morality and justice, to apply the maxim *falsus in uno, falsus in omnibus*. What ground of judicial belief can there be left, when the party has shown such gross insensibility to the difference between right and wrong, between truth and falsehood ? The contradictions in the testimony of the witnesses of the libellants have been exposed at the bar with great force and accuracy ; and they are so numerous that, in ordinary cases, no Court of justice could venture to rely on it without danger of being betrayed into the grossest errors. But in a case of the description of that before the Court, where the sovereignty and rights of a foreign belligerent nation are in question, and where the exercise of jurisdiction over captures made under its flag, can be justified only by clear proof of the violation of our neutrality, there are still stronger reasons for abstaining

1822.

The
Santissima
Trinidad.

Application of the maxim, *falsus in cuno, falsus in omnibus*.

from interference, if the testimony is clouded with doubt and suspicion. We adhere to the rule which has been already adopted by this Court, that restitution ought not to be decreed upon the ground of capture in violation of our neutrality, unless the fact be established beyond all reasonable doubt.

But the present case does not stand upon this testimony alone. It derives its principal proofs altogether from independent sources, to the consideration of which the attention of the Court will now be directed.

Our municipal laws do not prohibit the trade in contraband articles. It is merely subject, by the law of nations, to the penalty of confiscation, in case of capture.

The question as to the original illegal armament and outfit of the Independencia may be dismissed in a few words. It is apparent, that though equipped as a vessel of war, she was sent to Buenos Ayres on a commercial adventure, contraband, indeed, but in no shape violating our laws on our national neutrality. If captured by a Spanish ship of war during the voyage she would have been justly condemned as good prize, and for being engaged in a traffick prohibited by the law of nations. But there is nothing in our laws, or in the law of nations, that forbids our citizens from sending armed vessels, as well as munitions of war, to foreign ports for sale. It is a commercial adventure which no nation is bound to prohibit; and which only exposes the persons engaged in it to the penalty of confiscation. Supposing, therefore, the voyage to have been for commercial purposes, and the sale at Buenos Ayres to have been a *bona fide* sale, (and there is nothing in the evidence before us to contradict it,) there is no pretence to say, that the original outfit on the

voyage was illegal, or that a capture made after the sale was, for that cause alone, invalid.

1822.

The Santissima Trinidad.

Augmentation of the force of the Independencia in our ports.

The more material consideration is as to the augmentation of her force in the United States, at a subsequent period. It appears from the evidence, and, indeed, is admitted by Captain Chaytor, that after the sale in May, 1816, the Independencia sailed for Buenos Ayres under his command, on a cruise against Spain; and after visiting the coast of Spain, she put into Baltimore early in the month of October of the same year, having then on board the greater part of her original crew, among whom were many Americans. On her arrival at Baltimore, she was received as a public ship, and there underwent considerable repairs. Her bottom was new coppered, some parts of her hull were recaulked, part of the water-ways were replaced, a new head was put on, some new sails and rigging to a small amount, and a new mainyard was obtained, some bolts were driven into the hull, and the mainmast, which had been shivered by lightning, was taken out, reduced in length, and replaced in its former station. In order to make these repairs, her guns, ammunition and cargo were discharged under the inspection of an officer of the customs, and when the repairs were made, the armament was replaced, and a report made by the proper officer to the collector, that there was no addition to her armament. The Independencia left Baltimore in the latter part of December, 1816, having then on board a crew of 112 men; and about the 8th of January following, she sailed from the Capes of the Chesapeake on the cruise on which

the property in question was captured, being accompanied by the Altravida, as a tender, or despatch vessel. It will be necessary, hereafter, to make more particular mention of the Altravida; but, for the present, the observations of the Court will be confined to the Independencia. It is admitted by the claimant, that during her stay at Baltimore, several persons were enlisted on board the Independencia, and his own witnesses prove that the number was about thirty.

The first observation that occurs on this part of the case is, that here is a clear augmentation of force within our jurisdiction. The excuse offered is, that the persons so enlisted, represented themselves, or were supposed to be, persons in the service of Buenos Ayres. Of this, however, there is not the slightest proof. The enlistment of men being proved, it is incumbent on the claimant to show that they were persons who might lawfully be enlisted; and as the burden of proof rests on him, the presumption necessarily arising from the absence of such proof is that they were not of that character. It is not a little remarkable that not a single officer of the Independencia has been examined on this occasion. They are the persons who, from their situation, must have been acquainted with the facts; and the total omission to bring their testimony into the cause can scarcely be accounted for but upon a supposition extremely unfavourable to the innocence of the transaction.

Another observation which is drawn from the predicament of this case is, that if, as the claimant as-

*Onus probandi on the claimant, to show that the augmentation of force by enlistment was lawful.*

serts, the original voyage to Buenos Ayres, was a mere commercial adventure, the crew must have been composed principally of Americans or residents in our country. They enlisted at Buenos Ayres on board the Independencia, as officers and seamen for the purposes of warfare, and there is no evidence in the case as to the length of time of their engagements, or of the place where the crime was to terminate. Why are the documents on this subject, for documents must exist, in the possession of the claimant ; why are they not produced ? If the cruise was to terminate at Buenos Ayres, or at a specific period of time, the fact would have a material bearing on the merits of the cause. Yet though the pressure of this point must, at all times, have been forcibly felt, there has not, up to the present moment, been the slightest effort to relieve it from the darkness which thus surrounds it. Under such circumstances, the natural conclusion would seem to be that the crew were to be discharged, and the cruize to terminate at Baltimore. This was their native or adopted home, the place where they first embarked on board the Mammoth, and that to which most of them must be supposed solicitous to return. The conduct of the vessel indicated the same intent. She underwent general repairs, some of which could hardly be deemed of great necessity, and must have been induced by the consideration that Baltimore was a port peculiarly well fitted for naval equipments. During the repairs (a period of two months) the crew were necessarily on shore ; and it is scarcely to be supposed that they were held together by

any common bond of attachment, or that they had so far lost the common character of seamen as not to be easily led into some other employment or enterprise, which should yield immediate profit. What proof, indeed, is there that the same crew which came to Baltimore sailed again in the Independencia on her new cruise ? It is stated only as hearsay by one or two of the claimant's witnesses, who had no means, and do not pretend to any means of accurate knowledge of the fact. If true, it might have been proved by the officers of the ship, by the muster roll of the crew, and by the shipping articles; and these are wholly withdrawn from the cause, without even an apology for their absence. It would certainly be an unreasonable credulity for the Court, under such circumstances, to believe that the actual augmentation of force was not far greater than what is admitted by the party, and that there was either an innocence of intention or act in the enlistments. The Court is, therefore, driven to the conclusion, that there was an illegal augmentation of the force of the Independencia in our ports, by a substantial increase of her crew ; and this renders it wholly unnecessary to enter into an investigation of the question, whether there was not also an illegal increase of her armament.

Illegal outfit of the Altravida.

If any doubt could be be entertained as to the Independencia, none can be as to the predicament of the Altravida. This vessel was formerly a privateer, called the Romp, and was condemned for illegal conduct by the District Court of Virginia; and under the decree of the Court, was sold, together with the ar-

mament and munitions of war then on board. She
was purchased ostensibly for a Mr. Thomas Taylor,
but was immediately transferred to Captain Chaytor.
She soon afterwards went to Baltimore, and was attach
ed as a tender to the Independencia, having no separate
commission, but acting under the authority of Captain
Chaytor. Part of her armament was mounted, and
a crew of about twenty-five men were put on board
at Baltimore. She dropped down to the Patuxent
a few days before the sailing of the Independencia,
and was there joined by the latter, and accompanied
her on a cruise in the manner already mentioned.
Here, then, is complete evidence from the testimony
introduced by the claimant himself of an illegal out-
fit of the Altravida, and an enlistment of her crew
within our waters for the purposes of war. There
is no pretence that the crew was transferred to her
from the Independencia, for the claimants own wit-
nesses admit that a few only were of this descrip-
tion. The Altravida must be considered as attached
to, and constituting a part of the force of the Inde-
pendencia, and so far as the warlike means of the
latter were increased by the purchase, her military
force must be deemed to be augmented. Not the
slightest evidence is offered of the place or circum-
stances under which the enlistment of the crew took
place. It consisted, according to the strong lan-
guage of the testimony, of persons of all nations; and
it deserves consideration, that throughout this volu-
minous record, not a scintilla of evidence exists to
show that any person on board of either vessel was a

native of Buenos Ayres.  We think, then, that the
fact of illegal augmentation of force, by the equip-
ment of the Altravida, is also completely established
in proof.

What, then, are the consequences which the law
attaches to such conduct, so far as they respect the
property now under adjudication? It is argued on the
part of the libellant, that it presents a *casus fœderis*
under our treaty with Spain.  The sixth and four-
teenth articles are relied upon for this purpose.  The
former is in our judgment exclusively applicable to
the protection and defence of Spanish ships within
our territorial jurisdiction, and provides for the res-
titution of them when they have been captured with-
in that jurisdiction.  The latter article provides, that
no subject of Spain " shall apply for, or take any
commission or letter of marque for arming any ship
or ships to act as *privateers*," against the United
States, or their citizens, or their property, from any
prince or state with which the United States shall
be at war ; and that no citizen of the United States
" shall apply for, or take any commission or letters
of marque, for arming any ship or ships to act *as
privateers*" against the King of Spain, or his sub-
jects, or their property, from any prince or state
with which the said king shall be at war.  " And
if any person of either nation shall take such com-
mission or letter of marque, he shall be punished as
a *pirate*."  In the Spanish counterpart of the treaty,
the word " privateers" in the first clause has the
corresponding word " corsarios ;" but in the second
clause, no such word is to be found.  But it is ob-

The sixth arti-
cle of the Spa
nish treaty of
1795, only pro-
vides for the
restitution of
Spanish ships
captured within
our jurisdic-
tion.

vious that both clauses were intended to receive, and ought to receive, the same construction; and the very terms of the article confine the prohibition to commissions, &c. to *privateers*. It is not for this Court to make the construction of the treaty broader than the apparent intent and purport of the language. There may have existed, and probably did exist, reasons of public policy which forbade an extension of the prohibition to public ships of war. It might well be deemed a breach of good faith in a nation to enlist in its own service an acknowledged foreigner, and at the same time subject him by that very act, and its own stipulations, to the penalties of piracy. But it is sufficient for the Court, that the language of the treaty does not include the case of a public ship, and we do not perceive that the apparent intention or spirit of any of its provisions, justifies such an interpolation. The question, then, under the Spanish treaty, may be dismissed without further commentary.

This view of the question renders it unnecessary to consider another which has been discussed at the bar respecting what is denominated the right of expatriation. It is admitted by Captain Chaytor, in the most explicit manner, that during this whole period his wife and family have continued to reside at Baltimore; and so far as this fact goes, it contradicts the supposition of any real change of his own domicil. Assuming, for the purposes of argument, that an American citizen may, independently of any legislative act to this effect, throw off his own allegiance to his native country, as to which we give no

*margin:*
1822.
The Santissima Trinidad.

*Quere,* as to the doctrine of expatriation!

1822.

The
Santissima
Trinidad.

opinion, it is perfectly clear, that this cannot be done without a *bona fide* change of domicil under circumstances of good faith. It can never be asserted as a cover for fraud, or as a justification for the commission of a crime against the country, or for a violation of its laws, when this appears to be the intention of the act. It is unnecessary to go into a farther examination of this doctrine; and it will be sufficient to ascertain its precise nature and limits, when it shall become the leading point of a judgment of the Court.

And here we are met by an argument on behalf of the claimant, that the augmentation of the force of the Independencia within our ports, is not an infraction of the law of nations, or a violation of our neutrality; and that so far as it stands prohibited by our municipal laws the penalties are personal, and do not reach the case of restitution of captures made in the cruize, during which such augmentation has taken place. It has never been held by this Court, that an augmentation of force or illegal outfit affected any captures made after the original cruize was terminated. By analogy to other cases of violations of public law the offence may well be deemed to be deposited at the termination of the voyage, and not to affect future transactions. But as to captures made during the same cruize, the doctrine of this Court has long established that such illegal augmentation is a violation of the law of nations, as well as of our own municipal laws, and as a violation of our neutrality, by analogy to other cases, it infects the captures subsequently made with the character

An augmentation of force or illegal outfit only affects captures made during the cruise for which such augmentation or outfit was made.

of torts, and justifies and requires a restitution to the parties who have been injured by such misconduct. It does not lie in the mouth of wrongdoers, to set up a title derived from a violation of our neutrality. The cases in which this doctrine has been recognized and applied, have been cited at the bar, and are so numerous and so uniform, that it would be a waste of time to discuss them, or to examine the reasoning by which they are supported: More especially as no inclination exists on the part of the Court to question the soundness of these decisions. If, indeed, the question were entirely new, it would deserve very grave consideration, whether a claim founded on a violation of our neutral jurisdiction could be asserted by private persons, or in any other manner than a direct intervention of the government itself. In the case of a capture made within a neutral territorial jurisdiction, it is well settled, that as between the captors and the captured, the question can never be litigated. It can arise only upon a claim of the neutral sovereign asserted in his own Courts or the Courts of the power having cognizance of the capture itself for the purposes of prize. And by analogy to this course of proceeding, the interposition of our own government might seem fit to have been required before cognizance of the wrong could be taken by our Courts. But the practice from the beginning in this class of causes, a period of nearly 30 years, has been uniformly the other way; and it is now too late to disturb it. If any inconvenience should grow out of it, from reasons of state policy or executive discretion, it is competent

1822.

The
Santissima
Trinidad.

Captures by
public ships, as
well as by pri-
vateers, if made
in violation of
our neutrality,
are subject to
restitution.

for Congress to apply at its pleasure the proper re-
medy.

It is further contended by the claimant, that the
doctrine heretofore established has been confined to
cases of captures made by privateers ; and that it has
never been applied to captures by public ships, and in
reason and policy ought not to be so applied. The case
of the *Cassius*, in 3 *Dall. Rep.* 121., has been sup-
posed at the bar to authorize such an interpretation
of the doctrine. That was the case of a motion for
a prohibition to the District Court to prohibit it from
exercising jurisdiction on a libel filed against the
Cassius, a public armed ship of France, to obtain
compensation in damages *in rem*, for an asserted il-
legal capture of another vessel belonging to the li-
bellants on the high seas, and sending her into a
French port for adjudication, as prize. The libel
alleged that the Cassius was originally equipped
and fitted for war in a port of the United States con-
trary to our laws, and the law of nations. But there
was no allegation that she had been originally fitted
out by her present commander, or after she became
the property of the French government. The princi-
pal question was, whether our Courts could sustain
a libel for compensation *in rem* against the *capturing
vessel* for an asserted illegal capture as prize on the
high seas, when the prize was not brought into our
ports, but was carried into a port *infra præsidia* of
the captors. The Court granted the prohibition ;
but as no reasons were assigned for the judgment,
the only ground that can be gathered, is that which
is apparent on the face of the writ of prohibition,

where it is distinctly asserted, that the jurisdiction in cases of this nature exclusively belongs to the Courts of the capturing power, and that neither the public ships of a nation, nor the officers of such ships are liable to be arrested to answer for such captures in any neutral Court. The doctrine of that case was fully recognized by this Court in the case of the *Invincible*, (1 *Wheat R.* 238.;) and it furnishes a rule for the exemption of a public ship from proceedings *in rem*, in our Courts for illegal captures on the high seas, in violation of our neutrality ; but in no degree exempts her *prizes* in our ports from the ample exercise of our jurisdiction.

Nor is there in reason or in policy any ground for a distinction between captures in violation of our neutrality by public ships, and by privateers. In each case the injury done to our friend is the same ; in each the illegality of the capture is the same ; in each the duty of the neutral is equally strong to assert its own rights, and to preserve its own good faith, and to take from the wrongdoer the property he has unjustly acquired, and reinstate the other party in his title and possession which have been tortiously devested. This very point was directly asserted by this Court in its judgment in the causes of the Invincible. Mr. Justice JOHNSON there said, " as to the restitution of prizes made in violation of neutrality, there could be no reason suggested for creating a distinction between the national and the private armed vessels of a belligerent. Whilst a neutral yields to other nations the unobstructed exercise of their sovereign or belligerent rights, her own dignity and secu-

1822.
The
Santissima
Trinidad.

rity require of her the vindication of her own neutrality, and of her sovereign right to remain the peaceable and impartial spectator of the war. As to her it is immaterial in whom the property of the offending vessel is vested. The commission under which the captors act is the same, and that alone communicates the right of capture, even to a vessel which is national property." We are satisfied of the correctness of this doctrine, and have no disposition to shake it. In cases of violation of neutral territorial jurisdiction no distinction has ever been made between the capture of public and private armed ships; and the same reason which governs that, applies with equal force to this case.

An objection of a more important and comprehensive nature has been urged at the bar, and that is, that public ships of war are exempted from the local jurisdiction by the universal assent of nations ; and that as all property captured by such ships is captured for the sovereign, it is, by parity of reasoning, entitled to the like exemption ; for no sovereign is answerable for his acts to the tribunals of any foreign sovereign.

Case of the Exchange, 7 Cranch, 116. distinguished from this case.

In the case of the *Exchange*, (7 *Cranch*, 116.) the grounds of the exemption of public ships were fully discussed and expounded. It was there shown that it was not founded upon any notion that a foreign sovereign had an absolute right, in virtue of his sovereignty, to an exemption of his property from the local jurisdiction of another sovereign, when it came within his territory ; for that would be to give him sovereign power beyond the limits of his own empire.

But it stands upon principles of public comity and convenience, and arises from the presumed consent or license of nations, that foreign public ships coming into their ports, and demeaning themselves according to law, and in a friendly manner, shall be exempt from the local jurisdiction. But as such consent and license is implied only from the general usage of nations, it may be withdrawn upon notice at any time, without just offence, and if afterwards such public ships come into our ports, they are amenable to our laws in the same manner as other vessels. To be sure, a foreign sovereign cannot be compelled to appear in our Courts, or be made liable to their judgment, so long as he remains in his own dominions, for the sovereignty of each is bounded by territorial limits. If, however, he comes personally within our limits, although he generally enjoy a personal immunity, he may become liable to judicial process in the same way, and under the same circumstances, as the public ships of the nation. But there is nothing in the law of nations which forbids a foreign sovereign, either on account of the dignity of his station, or the nature of his prerogative, from voluntarily becoming a party to a suit in the tribunals of another country, or from asserting there any personal, or proprietary, or sovereign rights, which may be properly recognized and enforced by such tribunals. It is a mere matter of his own good will and pleasure; and if he happens to hold a private domain within another territory, it may be that he cannot obtain full redress for any injury to it, except through the instrumentality of its Courts of justice. It may there-

fore be justly laid down as a general proposition, that all persons and property within the territorial jurisdiction of a sovereign, are amenable to the jurisdiction of himself or his Courts : and that the exceptions to this rule are such only as by common usage, and public policy, have been allowed, in order to preserve the peace and harmony of nations, and to regulate their intercourse in a manner best suited to their dignity and rights. It would indeed be strange, if a license implied by law from the general practice of nations, for the purposes of peace, should be construed as a license to do wrong to the nation itself, and justify the breach of all those obligations which good faith and friendship, by the same implication, impose upon those who seek an asylum in our ports. We are of opinion that the objection cannot be sustained; and that whatever may be the exemption of the public ship herself, and of her armament and munitions of war, the prize property which she brings into our ports is liable to the jurisdiction of our Courts, for the purpose of examination and inquiry, and if a proper case be made out, for restitution to those whose possession has been devested by a violation of our neutrality ; and if the goods are landed from the public ship in our ports, by the express permission of our own government, that does not vary the case, since it involves no pledge that if illegally captured they shall be exempted from the ordinary operation of our laws.

The last question which has been made at the bar, on which it is necessary to pronounce an opinion, is as to the effect of the asserted condemnation of the

property in controversy, at Buenos Ayres, during the pendency of this suit. Assuming, for the purpose of argument, that the condemnation was regularly made, and is duly authenticated, we are of opinion that it cannot oust the jurisdiction of this Court, after it had once regularly attached itself to the cause. By the seizure and possession of the property, under the process of the District Court, the possession of the captors was devested, and the property was emphatically placed in the custody of the law. It has been since sold, by consent of the parties, under an interlocutory decree of the Court, and the proceeds are deposited in its registry, to abide the final adjudication. Admitting, then, that property may be condemned in the Courts of the captor, while lying in a neutral country, (a doctrine which has been affirmed by this Court,) still it can be so adjudicated only while the possession of the captor remains; for if it be devested, in fact, or by operation of law, that possession is gone which can alone sustain the jurisdiction. *A fortiori*, where the property is already in the custody of a neutral tribunal, and the title is in litigation there, no other foreign Court can, by its adjudication, rightfully take away its jurisdiction, or forestall and defeat its judgment. It would be an attempt to exercise a sovereign authority over the Court having possession of the thing, and take from the nation the right of vindicating its own justice and neutrality.

Upon the whole, it is the opinion of the Court that the decree of the Circuit Court be affirmed, with costs.

1822.

The Santissima Trinidad.

Condemnation at Buenos Ayres, no bar to the present proceedings.