BATTLE, J. Where a witness has wilfully perjured himself in the oath taken on the trial then in progress, in any one particular, the Court should instruct the jury, as a rule of law, that his whole testimony should be disregarded.
On the trial, a witness by the name of Jordan Motly, having been examined on behalf of the prosecution, was asked, *Page 258 
upon his cross examination, whether he had made as full a disclosure to the grand jury (before whom he had been sworn) as he had done on this trial? He answered that he had not: that some of the acts and declarations of the prisoner, he had never disclosed heretofore, except to the State's counsel: that his motive for making this suppression was to favor the prisoner: that in certain communications, which had passed between them, the prisoner had appealed to him, and said a full disclosure would go hard with him, and he had promised the prisoner not to testify against him, any further than he was compelled: that in pursuance of this promise, he proposed to the grand jury, on his examination before them, that he would answer such questions as they might think proper to ask him; to which they acceded: so far as he was interrogated, he stated before that body every thing truly; but as to the things that had been added in his present statement, he was not questioned, and so he avoided giving them in evidence.
The prisoner's counsel called on the Court to instruct the jury, that as the witness stood convicted, by his won confession of a perjury, in wilfully suppressing the truth before the grand jury, they should not take his evidence into consideration in making up their verdict.
His Honor declined giving the instruction, as asked; but told them that "the objection taken, went to the credibility of the witness, and they were at liberty to take into consideration his evidence, in connection with the other evidence and to say what it was worth."
To which the defendant's counsel excepted. Verdict of guilty. Judgment and appeal.
The instruction was asked for upon the authority of State v. Jim, 1 Dev. 509. Conceding that perjury is committed, as well by the corrupt suppression of truth, as by the suggestion of falsehood, and that the matter suppressed *Page 259 
by the witness before the grand jury was material, the question is presented, does the decision in that case settle, as a rule of evidence in the Common Law Courts, the doctrine contended for by the prisoner's counsel?
This question has been fully discussed: we have had the aid of two argument at this term, for it so happened that the same point was made inState v. Alfred Woodly. (See next case.) There, the examination of the principal witness on the part of the State, taken in writing by the committing magistrate, varied from his testimony before the jury, and his Honor, Judge PERSON, held that if the jury were satisfied that any material part of his testimony, given before them, was corruptly false, the whole must be rejected: but that if perjury was committed upon his examination before the magistrate, "the rule" did not apply, and the evidence was to be weighed by the jury.
The Attorney General insisted that this was the proper limit of the rule, and that it had no application unless a false oath was taken before the jury who were trying the issue. He admitted this distinction was not taken in Jim's case — there the variance was between the testimony given to the jury who were trying the issue, and that given to a jury on a former trial; but he contended that without this distinction, trials would become so complicated as to render it impossible to reach the merits, and cases would turn, not upon the question of guilt, but upon the conflict of testimony. He suggested as a further ground in support of the distinction, when the false oath is taken before the trial, there is locus penitentiae, and reason to suppose, more or less probable in proportion to the interval of time between the two oaths, that the witness has reformed and become a better man: whereas there is no room for reformation when the false oath is taken presently — before the jury who are trying the issue.
The first ground may have some force as an objection to the rule itself; but it has no tendency to fix the limit of the rule, because it rests entirely upon the degree of inconvenience, which, having no limit of its own, can make none for the rule. *Page 260 
The second is too narrow to be made the foundation of a rule of law: For that purpose, it would seem, something broader is necessary than the possibility that one who committed perjury yesterday, had, by to-day "reformed and become a better man." Besides, it is opposed to the analogy of the rule of evidence, of which the rule under consideration is a corrollary. One convicted of perjury, is an incompetent witness, although the offense was committed ten years ago. No regard, whatever, is paid to the length of time during which there was room for reformation, and the possibility that the witness "had seen the error of his ways."
The proper limit of the rule must depend on the reason on which it is founded: The reason given for it is, that "there is no difference in principle and should be none in practice, between a person heretoforejudicially convicted of perjury and one who stands convicted, before the jury who are trying the issue, of a perjury committed in the case."
The reason includes any perjury committed during the progress of the case, of which the evidence before the jury is sufficient to convict the witness: of course the rule must be equally broad in its operation.
The notion, that the operation of the rule is limited to cases where perjury is committed before the jury who are trying the issue, is not supported by any authority or even a dictum to be met with in the books; on the contrary, it is opposed by the only two cases in which the existence of the rule is supposed to be recognised and acted on by a court of Common Law. In Jim's case, the false oath was supposed to have been taken upon a former trial, or rather it was considered immaterial to ascertain upon which trial the false oath was taken, it being sufficient for the jury to be satisfied from the evidence before them, that a false oath had been taken, of which the variance between these two oaths was plenary proof. InDunlap v. Patterson, 5 Cow. 243, (the only other case to be met with where the rule is acted on) the false oath had been taken in the trial of an action between different parties, although in regard to the same subject matter. *Page 261 
We are satisfied there is nothing in principle, analogy or authority, to restrain the operation of the rule to cases where perjury is committed before a jury who are trying the issue: on the contrary, the authorities, the analogy and the principle, upon which it is founded, bring within its operation, every case in which the jury, from the evidence before them, are satisfied that a witness has committed perjury. The rule gives to the conclusion of the jury the effect, and treats it as tantamount to a judicial conviction of perjury, and is put upon the single point, are the jury satisfied that the witness has committed perjury? If so, he is just as unworthy of belief as if he had been judicially convicted of it, without reference to the fact whether the perjury was committed upon a former trial of the issue, or before the committing magistrate or the grand jury, or the jury who are then trying the issue.
So the broad question is, does Jim's case settle any rule of evidence, to be acted on by a Court of Common Law where a jury is interposed for the trial of all cases of fact?
The point decided in Jim's case is this: the Judge, in the court below, charged the jury that "evincing a sound discretion, they might reject part of a witness' testimony which they did not believe, and act on such part as they did believe." To this the prisoner excepted, and this Court award avenire de novo for error in the charge. Mr. Badger, amicus curiae, suggested that if the jury thought a witness had sworn corruptly false, in any particular, they should disregard the testimony of such witness intoto: He stated "the reason of the rule to be, that the jury had, quoad the particular case, judicially ascertained the corruption of the witness, and therefore as to that case the result was the same, as in all other cases, where the corruption was judicially ascertained by a conviction for perjury." Mr. Devereux, in place of the Attorney General, admitted the rule to be as stated by Mr. Badger. HENDERSON, Judge, adopts the reasoning of Mr. Badger, and comes to the conclusion that the Judge below erred: he says, "I can see no difference in principle, and if so, there should be none in practice, between a person heretofore convicted, *Page 262 
and one who stands convicted before the jury in the case they are trying. Hence the maxim falsum in uno, falsum in omnibus."
TAYLOR, Ch. Justice, also comes to the conclusion that the Judge below erred: but he puts his opinion upon a different ground, to wit, "our faith cannot be partial or fractional, the maxim being falsum in uno, c.:" and the Judges agree, that as the jury may have been misled by the charge, and the case affects the life of the prisoner, there should be a venire denovo.
No authority is cited by the counsel, or by either of the Judges, and the question is, was it their intention and the scope of the decision, merely to say that the Judge erred in telling the jury that they might reject part of a witness' testimony, which they believed to be corruptly false, and act on such part as they did believe? Or, did the Judges intend to import and make a part of the Common Law, a maxim of the Civil Law, which is not applicable to a trial by jury, and for which there is no authority, analogy or principle?
After much reflection, we have come to the conclusion that the decision in Jim's case was misunderstood; and this accounts for the fact (which we have by tradition) that it was not concurred in by the profession, or the Judges on the circuit. This misconception grew out of the inference, that as the decision in Jim's case prevented the Judge from encroaching upon the province of the jury by telling them they might act upon the testimony of a witness, whose evidence they believed to be corruptly false, it followed that the Judge had a right to encroach upon the province of the jury by withdrawing from them the testimony of a witness, upon the hypothesis, that the jury unanimously agreed that he had, in some part of the case, or the proceeding thereon, sworn corruptly false, so that they would convict him of perjury, if he was then on trial, from the evidence before them. This is evidently a non sequitur. In either case the question is one for the jury, and the Judge has no right to interfere by any artificial or fixed rule of Law. *Page 263 
We shall believe our proposition established if it appear that there is no authority, legal analogy or principle, in regard to the trial by jury, which will sustain any such rule of evidence as a matter of law, to be given in charge by the Judge to the jury. It cannot be assumed that the court in Jim's case intended to make a new rule of evidence.
Any one, upon the first blush, after reading Jim's case, would suppose that he could hardly open an English law book without meeting with the general rule "falsum in uno, falsum in omnibus," yet, strange as it may seem, he will not be able to find the rule laid down in any English book of reports or by any writer upon evidence. This is not merely full negative proof against the existence of any such rule, but there is full positive proof that there is no such rule. King v. Teal and others, 11 East Rep. 307, (decided in 1809) was an indictment, in the King's Bench, for conspiring falsely to charge the prosecutor with being the father of a bastard child, born of the body of Hannah Stringer, one of the defendants. A nol. pros. was entered as to her, and she was called as a witness for the Crown. She swore that Teal was, in fact, the father of her child: and that he had procured her to swear falsely, that the prosecutor was the father of it. Teal and another were convicted. Cockell, sergeant, was heard, as upon a rule for a new trial. The train of his argument was much the same as that of Mr. Badger. He urged that if the witness had been convicted of perjury, she could not have been examined at all, unless restored to credit by the King's pardon — that it was not the punishment that worked the infamy, but the crime, and it made no difference whether the infamy was found by a verdict, or by the confession of the party tendered as a witness. Being asked by the Court, "what he had to say to the common case of an accomplice giving evidence, though admitting himself guilty of a fact such as treason, which, if convicted of it, would render him incompetent?" he answered that there the accomplice did not admit himself guilty of the very crimen falsi which showed him unworthy of being believed. He then insisted much upon the case of *Page 264 Titus Oates, 4 St. Tri. 47, where the evidence of a witness, that he had before perjured himself, at the suggestion of the defendant was rejected, though the witness had not been convicted of perjury, and said this decision was approved of in Canning's case, 10 St. Tri. 390. "Upon the same principle," he said, "one who admits himself to be an infidel is disqualified to be a witness." Lord ELLENBOROUGH, Ch. J. "An infidel cannot admit the obligation of an oath at all, and cannot, therefore, give evidence under the sanction of it. But though a person may be proved on his own showing, or by other evidence, to have forsworn himself as to a particular fact, it does not follow that he can never afterwards feel the obligation of an oath though it may be a good reason for the jury, if satisfied that he had sworn falsely upon the particular point, to discredit his evidence altogether. But still that will not warrant the rejection ofthe evidence by the Judge. It only goes to the credit of the witness on which the jury are to decide." Cockell resumed his argument. Lord Chief Baron GILBERT says, "another thing that derogates from the credit of a witness is, if upon oath he affirm directly contrary to what he asserted. This takes from the witness all credibility inasmuch as contraries cannot be true:" and again he says, "if the mother of a bastard charges two persons, she looses her credibility and cannot charge either of them." Lord ELLENBOROUGH observed that these passages, contrasted with others, pointed at the distinction between competency and credibility and then called on Cockell to state his other objection. At the next term, Lord ELLENBOROUGH said the court had considered the objections, and were of opinion, "that there was no foundation for either of them."
From that time up to the present, the law in England has been settled: "settled" is not the proper term, for it never was unsettled; but from that time up to this, there has not been even a suggestion, that the rule falsumin uno, c., existed as a rule of evidence, to be enforced by the court in the common law courts.
We have not, of course, looked at every English case, but *Page 265 
we have the concurring testimony of all the writers that such is the fact. Phillips, Starkie, Chitty Crim. L., and Greenleaf, all treat the fact, that a witness, who contradicts himself, or confesses that he had sworn falsely, or when it is proven that he has made contradictory statements, either when on oath or not on oath, as tending to impeach his testimony before the jury, who are to weigh it, and to give to it the degree of credit to which they may think it entitled, just as they do the evidence of an accomplice, in which connection they treat of the subject; and the idea that the evidence must be withdrawn from the jury by the court under the rule falsumin uno, c., never is heard of.
Dunlap v. Patterson, 5 Cowen 243, was decided by the Supreme Court of New York in 1825. The action was trover, for the conversion of a boat: To prove that the boat was his property, the plaintiff called one Fuller, who swore that he purchased the boat for the plaintiff, as his agent. Upon cross-examination, Fuller acknowledged that he had, in an action for the boat between other parties, sworn that the boat belonged to him, and that he had purchased it for himself, and not as the agent of the plaintiff. A motion was made to non-suit the plaintiff, on the ground that Fuller's testimony should be rejected, and so, the plaintiff had offered no evidence of title. The court below refused the motion, and charged the jury that "Fuller was a competent witness, whose testimony should go to the jury, who might give it that weight which they thought it deserved." In the court above, WOODWORTH, Judge, who delivers the opinion, says this part of the charge is "manifestly erroneous," and the court decide that there was error in leaving the evidence of Fuller to be weighed by the jury instead of directing the plaintiff to be non-suited: on the ground, that the "unsupported testimony of a witness, who swore at one time in direct contradiction to the testimony given by him at another, in relation to the same transaction, was not entitled to credit, and ought not to be regarded." Although in reference to another point, he cites many cases, yet, in regard to this, the learned Judge cites none, and contents himself with *Page 266 
some general reasoning, such as ought to influence the tribunal which is to try the issue of fact, but he gives no reason why the court should invade the province of the jury, and tell them what should regulate their belief. This case, is like a witness who proves too much: for it goes beyond the rule supposed to be laid down in Jim's case, and includes a false oath taken by the witness in an action between other parties. We leave it with the single remark, that the court does not seem to have apprehended the distinction between matter which affects the competency of a witness, and that which affects his credit, although the distinction had been well taken in the court below.
Ingram v. Watkins, 1 Dev. and Bat. Rep. 442, was decided in 1836. OneJoseph Colson, a witness, called by the defendant, swore, among other things, that his father (under whom defendant set up title) had claimed a certain house as being upon his land, but had never lived in it. For the purpose of discrediting this witness, the plaintiff offered to show, that on a former trial, between the same parties, he had sworn that his father claimed and had occupied the house. This evidence was objected to, unless the witness could undertake to state, in substance, all that the witness, whom it was the object of the plaintiff to impeach, had sworn to on the former trial: which it was admitted he was unable to do. The evidence was received, and for this the defendant excepted. The exception was not sustained. GASTON, J., in delivering the opinion remarks, "It was the purpose of the plaintiff to bring the former testimony of the witness to the notice of the jury, as conflicting with his testimony on the present trial, and thereby satisfy them that the witness was not a man of veracity."To impeach the credit of a witness, one clear and advised contradiction is sufficient, since it is the rule of law, and of good sense, that he who falsifies himself in one point, is undeserving of belief in all —"falsus in uno, falsus in omnibus:" no more, therefore, of the witness' former declaration is necessary to be heard, than what is charged to be repugnant to his present statement." *Page 267 
This case was cited, we are told, for the purpose of showing that there is such a maxim as falsum in uno, c. It is agreed on all hands, that there is such a maxim, which addresses itself with more or less force, according to circumstances, to the tribunal which is to dispose of the issues of fact: but the question is, has this maxim been adopted as a rule of evidence to be acted on by the court, by which evidence is to be withdrawn from the jury, and treated as if the witness was incompetent? Was that the decision in Jim's case? We apprehend that this case is directly opposed to the inference that such was the decision. In the court below, it was offered to show that the witness had contradicted himself, for the purpose of discrediting him before the jury: the evidence was admitted. Why did not the plaintiff's counsel then insist that the testimony of the witness must,by a rule of law, be withdrawn from the jury upon the authority of Jim's case? In the court above, the evidence to contradict was held to have been properly admitted, as tending to satisfy the jury that the impeached witness was not a man of veracity, and the maxim falsum in uno, c., is referred to as a rule of law, and of good sense, whereby the credit of a witness may be impeached before a jury. No reference whatever is made toJim's case, or to the idea that the evidence was to be withdrawn from the jury by the court, by force of a rule of law; so that Jim's case is passed by in silence and disregarded, and thereby impliedly overruled, unless we suppose that the court considered that case as having decided no more than that the maxim, falsum in uno, was a matter that might be suggested to the jury as fit for their consideration.
State v. Peace, 1 Jones' Rep. 226, (1854.) A witness for the State, on cross-examination, said she could not tell whether a tree standing in the yard was a quarter of a mile or less from the house. It was held, that supposing the rule to be as expounded in State v. Jim, it did not apply, because the matter was immaterial. The court did not feel at liberty to go out of its way in order to discuss the decision in Jim's case; so this has no force on either side. *Page 268 
 In re Sanctissima Trinidad, 7 Wheaton 338, was in the admiralty court, and has no bearing on account of the difference between a court where the facts are decided by a fixed tribunal, and courts where it is the province of a jury to decide the issues of fact, as we shall take occasion to show below.
The result is, that the construction put on Jim's case, has no other support but Dunlap v. Patterson, and that stands by itself as the only instance in which a court of common law has converted the maxim, "falsum inuno, c.," into a rule of the law of evidence, to be enforced by the court, and is opposed by all the decisions that have ever been made in any other common law court!!
Next as to analogy. If a witness admits that he has committed murder or burglary, State v. Valentine, 7 Ire. Rep. 225, or felony in stealing a slave, State v. Haney, 2 Dev. and Bat. 390, he is nevertheless a competent witness, and his testimony is to be weighed by the jury, and they mayconvict upon it, provided it "carries to their minds full and entire conviction of its truth." Where is the difference between a witness who confesses that he has been guilty of these crimes and one who confesses that he has committed perjury? The idea that the latter was a confession of the crimen falsi is suggested by Cockell in King v. Teal: but the court said there was nothing in it; because murder, burglary, c., are crimes of a higher nature, and include, not merely a disregard of truth, but a disregard of all obligations and a total depravity and wickedness of heart: consequently a system of law would not be true to itself, which permitted the testimony of the former to be weighed by the jury, but required the testimony of the latter to be withdrawn from their consideration. This must be so, according to the maxim, "the greater includes the less." All the writers upon evidence treat of the evidence of an accomplice and the impeachment of a witness, by his confession, or by contradictory statements, in the same connection. So the analogy of the law is opposed to the construction which has been put on Jim's case.
Next, as to the principle or reason upon which such a rule *Page 269 
of evidence is based. Without discussing the relative merits of a fixed tribunal for the trial of facts, and the trial by jury, suffice it, that the common law prefers the latter, and considers it safer in the investigation of facts, to depend upon the good sense of a jury, than upon the knowledge of a judge; for the reason, that juries take a common sense view of every question, according to its peculiar circumstances; whereas a judge generalises, and reduces every thing to an artificial system, formed by study. Best on the principles of evidence, 66 vol. Law Library sec. 78. Jurors are not lawyers, or men acquainted with formal proceedings, but they are supposed to be men of ordinary good sense, somewhat acquainted with human nature, and with the motives and views that usually influence parties, and witnesses, and it is presumed that if the question to be decided is pointed out to them, and all incompetent evidence is excluded, they are more apt to arrive at the truth, than any other tribunal.
The charge of the Judge directs the attention of the jury to the question to be decided; his control over the admissibility of evidence excludes all that is incompetent, and the jury are relied on to find the truth. It is the exclusive province of the jury to decide issues of fact, and to pass upon the credit of witnesses; when the credit of a witness is to be passed on, each juror is called on to say, whether he believes him or not; this belief is personal, individual, and depends upon an infinite variety of circumstances; any attempt to regulate or control it, by a fixed rule, is impracticable, worse than useless, inconsistent and repugnant to the nature of a trial by jury, and calculated to take from it the chief excellence, on account of which it is preferred by the common law to any other mode of trial and to adopt in its place the chief objection to a fixed tribunal. "Do I believe what that witness has sworn to?" is a question for each juror. The statement may be more or less probable, and in accordance with the way in which men act and things occur. It may be more or less corroborated by the testimony of other witnesses and the attendant circumstances. The manner of the witness, even his looks, may impress my *Page 270 
mind, more or less favorably, and this is the reason every witness is required, by the common law, to be examined in the presence of the jury. Is it practicable to frame a general rule by which my belief must be regulated? Take the case of a witness, whose testimony upon a former trial, varies in a material particular from that he now swears to, which is Jim'scase: if the jury come to the conclusion that the oath now taken is false, they, of course, will give no credit to him; and a rule of law to that effect would be useless; but if they are satisfied that what he now swears is true, from which it follows that what he swore to on the former trial is false, then this rule of evidence excludes the truth; or rather, that which must be taken as true, before the rule can be applied.
Again: a witness denies that he made a different statement on the former trial, and it is proved that he did (as in Jim's case) by direct testimony; or it is proven by the written examination taken by the committing magistrate, in regard to which it is urged that the magistrate puts down the testimony in his own language, and does not adopt the very words used by the witness, which may account for the discrepancy, as in the State v.Woodly at this term; or the witness may confess that he had sworn differently before, and give as a reason, that he was induced so to swear, on account of threats that had been made against him; or that he was induced to suppress the truth by an undue influence exerted over him by the prisoner, or from motives of pity and with a view to favor him, (as in the present case,) and then there may be a question, whether this alleged favor to the prisoner was real, or a mere pretext adopted by the witness in order to have its effect with the jury? Is it practicable to frame a fixed rule to cover all of these different phases which the case may present?
Again: according to the supposed rule, the testimony of a witness is not to be excluded unless the jury, if he was then upon his trial, would convict him of perjury from the evidence before them; so the jury are to stop their enquiry as to the guilt of the prisoner, and put the witness on trial for perjury: if they all agree that he is perjured, the rule is useless. But *Page 271 
suppose eleven of the jury believe he has committed perjury and one dissent; then the supposed rule has no application, for it is not "the same in principle or practice, as if he had been judicially convicted of perjury," because this informal trial to which the jury are to subject the witness, has not resulted in his conviction by the unanimous verdict or conclusion of the jury; so the rule cannot be applied; each juror is left to give such weight to the testimony of the witness as, in his opinion, it is entitled to, and the only effect is, to introduce a trial within atrial, and thereby make the matter more complicated and difficult of solution.
For these reasons we are satisfied the decision in Jim's case has been misunderstood. It is indecent to suppose that the very learned counsel and the eminent Judges could have intended, without, or rather in defiance of authority, analogy or principle, to introduce a new rule as a law of evidence in a trial by jury, and more particularly that they should intend to do so in an opinion overruling the decision below, because the Judge did not allow the jury to weigh, without the influence of his opinion, the credibility of a witness.
Should it be asked, how did it happen that the counsel and the Judge, who took part in the trial of Jim's case, all used language which, it is assumed, did mislead the profession? we would venture to suggest this answer: it was the result of a misconception, whereby a maxim or "general rule," which had been adopted and acted on by the fixed tribunals for the decision of facts, according to the civil law and by the Judges in the Ecclesiastical Courts, and the Courts of Admiralty, and the Courts of Equity, which are fixed tribunals, for the decision of questions of fact, and mere emanations from the Civil Law, was assumed to be a rule of evidence in the courts of Common Law, without referring to the authorities or the legal analogy, or to the principle and "reason of the thing" growing out of the difference between the trial of facts by a jury, "a casual tribunal" selected for that particular trial, and the trial of facts by a fixed tribunal, the tendency of which is to generalise and reduce every case to an artificial system or rule formed by study. *Page 272 
So we are satisfied that nothing in Jim's case, when properly understood, nor any rule of evidence in the Common Law Courts, made it error in the presiding Judge to refuse to charge the jury, that if they believed that the witness had made a different statement before the grand jury, or had omitted to make the same he had made to them, they ought to acquit: and we think the Judge did his duty in leaving the whole matter as a question for the consideration of the jury.
In regard to the objection that upon the arraignment, the prisoners being asked how they would acquit themselves, said "they were not guilty;" which, as is contended, is a joint plea, and put upon the State the onus of proving that both of them were guilty: it is decided, in State v. Smith, 2 Ired. 402, that the general issue is always a several plea, and in this case it was so treated; for the other prisoner continued the case and this prisoner removed his for trial to the county of Person.
In regard to the objection that it does not appear from the record that the prisoner was asked "if he had any thing to say why sentence of death should not be pronounced against him?" it appears from the record that the prisoner was in court — moved for a venire de novo — was sentenced and prayed an appeal to this Court. It is true, according to the authorities read by the prisoner's counsel, it was held in England by many old cases to be error, unless the record showed that the prisoner, before sentence pronounced, was asked "if he had any thing to say, c.;" for it may be that he might have had ground for a motion in arrest, or might have pleaded a pardon. These cases have no application to the condition of things under which the law is administered in this State. Here the prisoner is in court, and before he is sentenced has a right to urge any objection that he pleases to make. He is entitled to have the benefit of counsel, who may urge in his behalf any ground in arrest. A pardon will avail him at any time before execution done; and having prayed an appeal, he has a righthere now, to make any motion in arrest, that he could have made in the court below, if he had been asked after his motion for a venire de novo was refused, if he had any thing further to say why sentence of death should not be pronounced. *Page 273