Ranney, J.
The plaintiff in error was indicted in the. court of common pleas of Tuscarawas county for the murder of Montgomery Webb, and, upon the trial, was found guilty of manslaughter, and sentenced to the penitentiary for six years.
The refusal of the court to give certain. instructions to the jury, as prayed for by him, as well as the instructions given, are assigned for error, and for that cause alone he seeks a reversal of the judgment.
Upon the argument, two questions, of very considerable nicety and practical importance, have been presented, which we shall proceed to dispose of in the order in which they appear in the record.
1. Erom the bill of exceptions it appears that, after the state had given evidence tending to prove that the plaintiff made an assault upon Webb in the street, with the intent to murder him with a knife, and that in the conflict which ensued, Webb was killed by him, the plaintiff in error gave evidence tending to prove that he desisted from the conflict, declined further combat, and retreated rapidly a distance of one hundred and fifty feet, and took refuge in the house of a stranger, where he shut and held the door; that Webb, his brother, and *49 one Dingman immediately pursued, throwing stones at him, and crying “kill him” as he retreated, and,'forcibly opening the door, they entered the house and assaulted him, and in the conflict which immediately ensued, Webb was killed.
Upon this state of the evidence, counsel for the plaintiff in error requested the court to instruct the jury, that the killing of Webb would be excusable, although the accused should have made the assault upon him with the malicious intent of killing him, if the jury should find that, before Webb had received any injury, the accused desisted from the conflict, and in good faith declined further combat, and retreated to a place which he might reasonably regard as a place of security, and that Webb and those in concert with him, immediately pursued and forcibly entered such place, and there made an assault upon the the accused, in such manner as to warrant him in believing that his life was in danger at the hands of Webb, and without deliberation or malice, and to save his own life, he took that of Webb.
This instruction the court refused to give, but, in substance, charged the jury that, under such circumstances, the accused would be guilty of manslaughter, provided they “ should regard the conduct of Webb, from the commencement of the conflict in the street to the time of the conflict in the house, as continuous.”
The difference between the instruction asked, and that given, is easily appreciated. The one makes the conduct of the accused in declining, in good faith, further conflict, and retreating to a place of supposed security from the attacks of Webb, decisive of his right to defend himself there, when afterwards assaulted by Webb and those in concert with him, and, if necessary to save his own life, without malice or premeditation, to take that of Webb: while the other makes the conduct of Webb the test whether the conflict had so far terminated as to restore the accused to his right of self-defense, and denies him this right, if the conduct of Webb, from the conflict in the street to that in the house, was to be regarded as continuous. We are not permitted to regard this retreat *50 of the accused, as either colorable, or made .to gain an advantage, with a view of'renewing the assault upon Webb. The instruction requested assumed that it must have been made with the bona fide purpose of abandoning the conflict; and in the instruction given, the jury were charged that if the attack upon Webb in the street was murderous, the fact that the accused “ repented and fled, . . . intending to quit the combat, and abandoning all murderous purpose,” would have no further effect than to mitigate the crime to manslaughter.
Upon the precise question made in this case, very little light is thrown by actual adjudications; and it is not to be denied, that some difference of opinion has obtained among elementary writers upon criminal law. The learned and humane Sir Matthew Hale has expressed an opinion, upon the very point, in accordance with the instruction requested in .the court below. He says : “ Suppose that A. by malice makes a sudden assault upon B., who strikes again, and pursuing hard upon A., A. retreats to the wall, and, in saving his own life kills B. — some have held this to be murder, and not se )defendendo, because A. gave the first assault. But Mr. Dalton thinketh it to be se defendendo, though A. made the first assault, either with or without malice, and then retreated. It seems to me, that if A. did retreat to the wall upon a real intent to save his life, and then merely in his own defense killed B., that it is se defendendo, and with this agrees Stamford’s P. C., lib. 1, c. 7, fol. 15a. But if on the other side, A., knowing his advantage of strength, or skill, or weapon, retreated to the wall merely as a design to protect himself under the shelter of the law, as in his own defense, but really intending to kill B., then it is murder or manslaughter, as the circumstance of the case requires.” — 1 Hale’s P. C 479, 480.
Sergeant Hawkins, however, thinks this opinion too favorable, and insists that the one who gives the first blow can not be permitted to kill the other, even after retreating to the wall; because the necessity, to which he is at last reduced, was brought upon himself. 1 Hawk. P. C. 87.
*51 Later English writers have generally contented themselves with stating the opposing opinions of these eminent authors, without adding anything material upon the subject. 4 Bl. Com. 186; 1 Russ, on Crimes, 662.
In our own country, Mr. Bishop, in his work on criminal law, has examined the whole subject with learning and ability, and coinciding, as we understand him, in the opinion expressed by Lord Hale, he thus expresses his own conclusion: “ The space for repentance is always left open. And when the combatant does in good faith withdraw as far as he can, really intending to abandon the conflict, and not merely to gain fresh strength or some new advantage for an attack, but the other will pursue him, then, if taking life becomes inevitable to save life, he is justified.” — 2 Bishop on Crim. Law, sec. 566.
But if the question can not be said to be settled upon authority, we think its solution upon principle very obvious, in the light of doctrines upon which all are agreed. ' It is very certain that while the party who first commences a malicious assault continues in the combat, and does not put into exercise the duty of withdrawing in good faith from the place, although he may be so fiercely pressed that he can not retreat, or is thrown upon the ground, or driven to the wall, he can not justify taking the life of his adversary, however necessary it may be to save his own; and must be deemed to have brought upon himself the necessity of killing his fellow man. “For otherwise,” as said by Ch. J. Hale, “we should have all cases of murder or manslaughter, by way of interpretation, turned into se defendeudo1 Hale, P. C. 482.
There is every reason for saying, that the conduct of the accused, relied upon to sustain such a defense, must have been so marked, in the matter of time, place, and circumstance, as not only clearly to evince the withdrawal of the accused, in good faith, from the combat, but also such as fairly to advise his adversary that his danger had passed, and to make his conduct thereafter, the pursuit of vengeance, rather than measures taken to repel the original assault. But when this is made to appear, we know of no principle, however criminal *52 the previous conduct of the accused may have been, which allows him to be hunted down and his life put in jeopardy, and denies him the right to act upon that instinct of self-preservation, which spontaneously arises alike in the bosoms of the just and the unjust. There is no ground for saying that this right is forfeited by previous misconduct; nor did the court below proceed upon any such idea, since the jury were charged, that if the conflict which ensued upon the first assault had ended, and a new one was made by Webb and his associates in the house, the accused, under reasonable apprehension of loss of life or great bodily harm, would be justified in taking the life of his assailant. The error of the court consisted in supposing that whatever might be done by the accused to withdraw himself from the contest, the conflict would never end so long as Webb made continuous efforts to prolong it. If this is a sound view of the matter, the condition of the accused would not have been bettered if he had fled for miles and had finally fallen down with exhaustion, provided Webb was continuous in his efforts to overtake him. But this view is consistent with néither the letter nor spirit of the legal principle. A conflict'is the work of at least two persons, and when one has wholly withdrawn from it, that conflict is ended; and it can not be prolonged by the efforts of him who remains to bring on another. It is very true, that the original assault may have aroused the passions which impel the pursuer to take vengeance upon his adversary; and if death should ensue from his act, it might be entirely sufficient to mitigate the crime. But it would still be a crime, and the law can not for a moment tolerate the execution of vengeance by private parties. If this were allowed, such passions might be as effectually aroused by words as blows; and, instead of the principle, so vital to the peace of society, that the law alone must be relied upon for the redress of all injuries, we should have avengers of injuries, real or supposed, executing their punishments upon victims stripped of all legal power, whatever might be the necessity of defending their own lives. It is needless to say, that such a course would be alike *53 destructive to public order and private security, and would be substituting for tbe empire of tbe laws, a system of force and violence.
A line of distinction must be somewhere drawn, which, leaving the originator of a combat to the necessary consequences of his illegal and malicious conduct, shall neither impose upon him punishments or disabilities unknown to the law, nor encourage his adversary to wreak vengeance upon him, rather than resort to the legal tribunals for redress; and we think, upon principle and the decided weight of authority, it lies precisely where we have already indicated. While he remains in the conflict, to whatever extremity he may be reduced, he can not be excused for taking the life of his antagonist to save his own. In such case, it may be rightfully and truthfully said, that he brought the necessity upon himself by his own criminal conduct. But when he has succeeded in wholly withdrawing himself from the contest, and that so palpably as, at the same time, to manifest his own good faith and to remove any just apprehension from his adversary, he is again remitted to his right of self-defense, and may make it effectual by opposing force to force, and, when all other means have failed, may legally act upon the instinct of self-preservation, and save his own life by sacrificing the life of one who persists in endangering it.
If these views are correct, their application, to the case under consideration, is very obvious. Both the instruction requested, and that given, are based upon the hypothesis, that the accused had, in good faith and abandoning all criminal purpose, withdrawn from the combat; that he had not only retreated to the wall, but behind the wall; and had not only gone from the view of his adversary, but to a place of supposed security from his attacks. In all this, his conduct was strictly lawful. In the language of the books, he “ had actually put into exercise the duty of withdrawing from the place.” It is very true, that the evidence tended to implicate him in a very serious crime in the first attack upon Webb, for which his subsequent conduct could not atone, and for which *54 he was then, and still is, liable to prosecution and punishment; but when Webb and his associates afterward pursued and attacked him, they were wholly in the wrong, and necessarily took upon themselves all the hazards of such an unlaw ful enterprise.
2. Upon the trial of the case, Frederick Swallow, Philander Webb, and A. I. Dingmah were called as witnesses for' the state, and each gave testimony material to the issue. Whereupon the accused called sundry witnesses, who gave testimony tending to prove that these three witnesses called for the state, had willfully and corruptly testified falsely upon some matters material to the issue in the case; and his counsel requested the court to instruct the jury, that if they should find such to be the fact, it would be their duty to disregard the whole of the testimony given by such witnesses. This instruction the court gave as to those portions of the testimony shown to be false, but as to other portions, not so shown, and in respect to which the witnesses might be corroborated, the jury were instructed that they might consider such portions in connection with the corroborating testimony, and give it such weight as they thought proper. The statement in the bill of exceptions is not very clear; but we suppose the court intended to say that no fact could be found upon the unaided testimony of such witnesses; but that their testimony might be received and acted upon, in connection with corroborating evidence, and such weight be given it as the jury should think proper. This, at least, is the most favorable view of the charge, and if it is the correct one, the naked question is presented, whether the rules of law require the absolute rejection of such testimony.
An ancient maxim of the law of evidence — -falsus in uno, falsus in omnibus — would seem to import such exclusion, by raising a presumption of law, juris et de jure, that a witness who is clearly shown to have committed perjury, upon one material point in the case, should be deemed wholly unworthy of credit upon any other, and his testimony be absolutely rejected. In most of the cases brought-to our attention in the *55 argument, where this maxim has been referred to, no attempt has been made to define its limits and proper application; while in many, it has been very inaccurately used as applicable -to witnesses who have been merely contradicted upon some material -point, without raising any just imputation of perjury against them. Among the elementary writers upon evidence, whose works have been examined by us, Mr. Starhie alone has stated the solid reasons upon which the maxim rests, and the case to which, alone, it can be applied. He says: “ As the credit due to a witness is founded, in the first instance on general experience of human veracity, it follows that a witness who gives false testimony as to one particular, can not be credited as to any, according to the legal maxim, falsum in uno, falsum in omnibus. The presumption that the witness will declare the truth, ceases as soon as it manifestly appears that he is capable of perjury. Faith in a witness’ testimony can not be partial or fractional; where any material fact rests on his testimony, the degree of credit due to him must be ascertained, and, according to the result, his testimony is to be credited or rejected.” “ It is scarcely necessary to observe,” he adds, “ that this principle does not extend to the total rejection of a witness whose misrepresentation has resulted from mistake or infirmity, and not from design; but though his honesty remain unimpeached, this is a consideration which necessarily 'affects his character for accuracy.” 1 Starkie’s Ev. 873.
Now, if, as this author says, the presumption that such a witness will speak the truth, is wholly gone, and for this reason his testimony is to be rejected, what, in the nature of things, can remain to submit to a jury, and from which they are to make up that complement of proof which establishes facts, as a foundation for the judgment of courts ? Is not this yielding the witness partial or fractional credit ? And that in the face of the fact, that before the eyes of the very tribunal which accords him this credit, and in the very proceeding, he has committed willful and corrupt perjury. To say that facts may be found upon his testimony, notwithstanding, or that *56 they may be found in part upon it, is a difference in degree only, and not in principle. The other evidence, although, in a greater or less degree, corroborative of his, is yet supposed to be insufficient to establish the fact in issue; and it is utterly impossible still to find the fact, without giving credit to the perjured witness. ■ But it is said he may still speak the truth, upon other points, although perjured as to one or more. This is very true. Yery few men are so utterly false as not to be compelled, from the very exigencies of their being, to utter more truth than falsehood. But it must also be admitted, that the motive which has prompted him to commit perjury in one part of his testimony, may and is very likely to lead him to make it effectual, by falsifying other material points. At best, it is left entirely uncertain whether he has uttered truth or falsehood; and it is not consistent with that moral certainty of the existence of facts, which the law requires before men are affected in their lives, liberty, or property, to act upon what may be true or false, or to use such corrupt and deceptive instrumentalities in the pursuit of truth. Upon the whole, we are inclined to agree with Mr. Justice Story in his opinion in the case of The Santissima Trinidad, 7 Wheat. 283, that “ where a party speaks to a fact, in respect to which he can not be presumed liable to mistake, courts are bound upon principles of law, morality, and justice, to apply the maxim, falsus in uno, falsus in omnibus.” And to ask with him, “what ground of judicial belief can there be left, where the party has shown such gross insensibility to the difference between right and wrong, between truth and falsehood?”
As remarked by Mr. Starkie: “ The character of a witness can not easily be subjected to minute investigation; the nature of the -proceeding usually excludes the benefit which might result from an extended and protracted inquiry, and a jury are under the necessity of forming their conclusions on a very limited and imperfect knowledge of the real characters of the witnesses, on whose testimony they are called on to decide.” — 1 Starkie’s Ev. 20. In a word, the temptations and *57 opportunities for deception in judicial inquiries are far greater than in the ordinary transactions of life; the tribunals must act promptly and decisively upon all the great interests which men hold valuable; and neither the rights of individuals, nor the moral effect of their determinations, can fail to suffer when they proceed upon evidence which is quite as likely to be deceptive as otherwise, and their findings as likely to be founded in error as in truth.
We are not unmindful of the fact, that persons convicted of crime are no longer excluded as witnesses. But the case of one convicted of perjury even, in a former proceeding, would differ from this, in the fact, that time for reformation would have intervened before he is called to testify, and no clear indication of a motive to commit perjury between the particular parties would be exhibited.
We think the court erred in refusing to give each of the instructions requested, aud also in the instructions given, and for that cause the judgment is reversed and the case remanded for further proceedings.
Brinkerhoef, C.J., and Scott, Wilder and White, JJ., concurred.