JUDGE WILLIAMS
delivered the opinion op the oohrt:
May 25, 1863, Martin bought of Hortin his farm in Rowan county, for three thousand dollars in “ Confederate moneyand as he could not then make a good title, and to get the money paid, he executed a covenant with security “to make to said Martin a good and sufficient deed of conveyance,” reciting that there was then a pending litigation as to said land.
This litigation afterwards resulted in a judgment in favor of Hortin’s vendors, and a lien upon the land, after which Martin brought this suit on the covenant to compel them to pay off and discharge said liens.
He also averred, that at the time of the trade the Confederate armies . had possession of said Rowan county, and that he had sold his farm and was compelled to take Confederate money, and that such currency circulated as money “ by force of the Confederate bayonets, the said counties of Letcher, Morgan, and Rowan being within the Confederate lines and its de facto jurisdiction and authorityalso, that Hortin took it voluntarily and used it as money for valuable purposes. To this petition the defendant, Hortin, demurred, which the court sustained, and dismissed plaintiff’s petition. To reverse this judgment is the object of this appeal.
It involves the single question whether Confederate currency voluntarily taken within the Confederate military lines and de facto jurisdiction, constitutes a valuable or vicious consideration.
*631 That the late rebellion soon grew into the dimensions of a civil war has been repeatedly recognized by this court and the supreme court of the United States. (See Prize Cases in 2 Black’s R. (S. C.), U. S.)
It has, however, been insisted, that as the secession of the Southern States was illegal and unconstitutional, that the government erected by them could not become a lawful belligerent; but both the British and United States governments, by precedent and judicial decision, had previously determined contra principles in “the recognition of Greece by England as a lawful belligerent during her efforts to become independent of Turkey, before her independence was recognized by Great Britain or any other nation.” ( Upton’s Maritime Warfare, 10.)
In United States vs. Palmer et al., 3 Wheaton, 610, which was an indictment against a citizen of the United States for robbery and piracy on the high seas, one of the defenses being that they were lawful privateers acting under a commission of a lawful belligerent, the sup eme court of the United States, by' Chief Justice Marshall, said: “ When a civil war rages in a foreign nation, one part of which separates itself into a new and distinct government, the courts of the Union must view and treat the newly-constituted government as it is viewed by the legislative and executive departments of the government of the United States. *■ * * The government of the United States having recognized the existence of civil war in question, the acts of the defendants were justified under the commission of the revolting territory as a lawful belligerent, and were in no manner unlawful or in violation of the act of Congress.”
And in the Divina Pastora, 4 Wheaton, 52, the supreme court of the United States said: “ The government of the United States having recognized the existence of civil *632 ■war between Spain and her colonies, our courts are bound to recognize as lawful those acts which war authorizes and the new government in South America may direct.”
And in the Santissima Trinidad (7 Wheat., 283), the supreme court, by Justice Story, said:
“ The government of the United States has recognized the existence of civil war between Spain and her colo- ■ nies. * * * Each party is, therefore, deemed by us .a belligerent nation, having, so far as concerns us, the sovereign rights of war.”
Upton on Maritime Warfare (p. 46) says : “ The institution of a blockade, under the law of nations, being the exercise of a purely belligerent right, presupposes the existence of war — of war which carries with it the consequences of a public war.” And this position is sustained by numerous decisions of the district and circuit courts of the United States, and finally by the supreme court in the prize cases in 2d Black's Reports, all growing out . of the late war.
At page 45 Mr. Upton says : “ The closing of the ports by municipal regulation, declaring them no longer ports of entry and delivery, is a sovereign right which can be exercised and enforced only within the territorial juris- ■ diction of the nationwhilst a “ belligerent blockade addresses itself to neutral commerce throughout the world.” He then proceeds to show the great advantage of resorting to a belligerent blockade under the law of nations, which can only be exercised when war actually exists, to that of closing the ports by municipal regulations. Thus civil war was recognized by the United States from the date of President Lincoln’s proclamation of blockade, and the federal judiciary has followed and acted upon this recognition until now a judicial *633 recognition of the war from that time has become universal throughout the Union.
The “Confederates” had created a government de-facto, and were trying by war to establish its sovereignty. This war, as a fact, was recognized by the United States. Thus a de facto government, consisting of one third of the States of the Union, constituted one party, and the government of the Union, denying their right to establish this de facto government, was the other; and in this conflict vast and important rights of the citizen must be involved, and much difficulty often experienced in ascertaining these rights.
Halleck, in his Elements of International Law and Laws of War (sec. 5, chap. 14, p. 151), in enumerating the “different kinds of war,” says : “ The term rebellion is applied to an insurrection of large extent or long duration ; and is usually a war between the legitimate government of a State and portions or parts of the same, who seek to overthrow the government, or to dissolve their allegiance to it, and to set up one of their own. The war of the ‘ Great Rebellion,’ in England, and of the rebellion of the southern States of the United States, may be referred to as examples under this head;” and in section 9, same chapter 153, he says: “Wars of insurrection, of rebellion, and of revolution, come under the general head of civil wars, and are governed by the same rules, so far as regards international law and the laws of war.”
And in section ten, same chapter, it is said, that “ it may be stated, as a general rule, that the laws of war, as understood and defined by the law of nations, govern in the commercia belli, or belligerent intercourse of the contending parties in civil wars.”
And in chapter fifteen, devoted to the “ declaration of war and its effects,” in section 22, page 166, he says,:-- *634 .“ Its effects upon the relations of the citizens of a belligerent State with their own government, belong to constitutional or municipal law rather than to general public law; nevertheless, as there are certain general principles which govern these relations in all countries and under all governments, it may be proper to allude to them. For example: any place, post, town, fortress, or section of country occupied by the enemy, is, for most purposes, regarded in law as hostile territory, so long as such occupation is continued. If the place so occupied was previously neutral, or a part of our own territory, it is no longer regarded as such, for it would be absurd to suppose that persons who are hostile themselves, or who are under a hostile authority, are to exercise the same civil rights as neutrals or citizens in- time of peace. The relations of the government to a place or territory so occupied or situated, are of a military character, and, consequently, are not regulated by the civil laws, which are made for the conditions of peace. This change of relation or rule of government does not result from any thing in the particular constitution or laws, but from the fact of the existence of war and the hostile occupation of the place; * * the absence of peace suspends the law of peace, and the presence of war substitutes military rule.”
And in chapter seven, on the rights of legislation and jurisdiction, section 4, page 86, it is said: “The general law of contracts is, that the validity of every contract is to be decided by the law of the place where it is made, or, in legal phraseology, the lex loci contractus is to govern in every thing respecting the form, interpretation, obligation, and effect of the contract.”
And this principle has been fully recognized in the adjudication of the United States court in United States *635 vs. Hayward, 2 Gallis. C. C. R., 501, or 2 Peters' U. S. Digest, 414, which grew out of the occupation of Castine, in Maine, by the British forces, in the war of 1812. The court held: “By the conquest and occupation of Castine, that territory passed under the temporary allegiance and sovereignty of the enemy. The sovereignty of the United States over the territory was suspended during such occupation, so that the laws of the United States could not be rightfully enforced there or be obligatory upon the inhabitants who remained and submitted to the conquerors. Castine, in Maine, during such occupation, was not a part of the United States in reference to the non-importation acts; but a territory conquered by an enemy is not considered as incorporated into the dominions of that enemy without a renunciation in a treaty of peace or a long and permanent possession. Until such incorporation, it is still entitled to the full benefit of the law of postliminy.”
The circulation of “ Confederate currency ” within the military lines and jurisdiction of the United States was forbidden by its laws and public policy, hence illegal. The circulation of United States treasury notes within the military lines and jurisdiction of the “Confederate States” was likewise prohibited by their laws and public policy. The laws and policy of each were to foster and encourage the circulation of their own currency, and to discourage and prohibit the circulation of the currency of their adversary; therefore, the non-combatant citizen must regulate his conduct by the laws and public policy of that power which might predominate over him for the time being. And as both belligerents claimed Kentucky, and recognized her right of representation in their National Congress, it may well be doubted whether by this both were not under the same obligation to treat her non-combatant people as citizens submissive to the laws *636 of the predominating military power, and in nowise belligerent enemies, save so far only as they made themselves individually actual belligerents; but however this may be, the currency that was recognized by the laws and military authorities of the Confederate States as money, and its circulation encouraged by its policy, and which did so circulate within its military lines and jurisdiction, must be regarded as a valuable and not a vicious or illegal consideration, especially when voluntarily received and used. To permit its reception and use, and then to escape from the obligation, by a party, would be to recognize a system of legalized robbery, which would be equally or. more odious to the sensitive justice of the law.
Wherefore, the judgment is reversed, with directions to the court below to overrule the demurrer.